**In re VIC BERNACCHI &
SONS, INC., Debtor.**

**VIC BERNACCHI & SONS, INC., First
Citizens Bank, N.A., Plaintiffs,**

v.

**John G. LOXAS, Defendant.**

**Bankruptcy No. 90–31352.
Proc. No. 91–3087.**

United States Bankruptcy Court,
N.D. Indiana,
South Bend Division.

July 11, 1994.

J. Richard Ransel, Thorne, Grodnik, Ransel, Duncan, Byron & Hostetler, Elkhart, IN, for Vic Bernacchi & Sons, Inc.

Rebecca Hoyt Fischer, Laderer & Fischer, South Bend, IN, for First Citizens Bank, N.A.

Michael Watkins, Barnes & Thornburg, South Bend, IN, and Jacqueline Sells Homann, Barnes & Thornburg, Elkhart, IN, for John G. Loxas.

### DECISION and ORDER

ROBERT K. RODIBAUGH, Bankruptcy Judge.

This matter is before the court on a COMPLAINT filed by the debtor, Vic Bernacchi & Sons, Inc. ("Bernacchi"). On December 10, 1992, the court entered a judgment finding in part that defendant, John G. Loxas ("Loxas"), had a perfected security interest in fixtures, and an unperfected security interest in certain personal property of the estate. Loxas appealed this decision to the United States District Court for the Northern District of Indiana. The judgment was affirmed except for the bankruptcy court's finding that none of the items of personal property in question were fixtures. The District Court remanded the case to the bankruptcy court to reconsider this finding. The hearing on remand was held March 14, 1994. Parties were given time to file briefs, and all parties having so filed, the matter was taken under advisement on May 16, 1994.

## Jurisdiction

This decision and order shall represent findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, made applicable in this proceeding by Federal Rule of Bankruptcy Procedure 7052. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(K), over which the court has jurisdiction pursuant to 28 U.S.C. § 157(b)(1).

## Background

On September 20, 1985, prior to the bankruptcy proceeding, Loxas and Bernacchi entered into a contract for sale to Bernacchi of the land, building, and assets of a retail supermarket located in Hammond, Indiana (the "Hammond Store").[1] The total purchase price of $1,050,000 represented $675,000 for the land and building and $375,000 for the other assets, plus an additional payment for the inventory. In conjunction with the purchase, Bernacchi executed a security agreement in favor of Loxas which covered the furniture, fixtures and equipment specifically identified on a schedule attached to the security agreement. The security agreement and a U.C.C. financing statement were filed on September 25, 1985, in the Lake County Recorder's office. At no pertinent time did Loxas file a financing statement with the Indiana Secretary of State.

Subsequently, Bernacchi obtained loans from First Citizens Bank ("Bank"), executing promissory notes and security agreements in favor of the Bank. Bernacchi's obligations to the Bank were secured by all of Bernacchi's assets, including machinery and equipment. The Bank perfected its security interests. By April 24, 1990, Bernacchi had defaulted on the notes.

On June 27, 1990, the bankruptcy case was commenced.[2] On July 3, 1990, Bernacchi filed a Complaint to Sell Property Free and Clear of Liens, seeking authority to sell all of its assets to Randall Weiss including the Hammond Store in which Loxas claimed an interest. The court entered its order on August 1, 1990, authorizing the sale. At the closing of the transaction on August 27, 1990, Bernacchi paid Loxas $898,959.12, of which approximately $322,000 was for the balance due with interest on the Bernacchi/Loxas purchase agreement for the business assets (fixtures and equipment).

In the present complaint Bernacchi alleged that Loxas had failed to perfect his security interest in the personal property he sold to Bernacchi. Thus, Bernacchi sought to recover the monies received by Loxas after the Weiss sale attributable to such personal property. The Bank intervened, joining in Bernacchi's attack upon Loxas' interest in the personal property and asserting its own perfected security interest in the same personal property.

In order to perfect a security interest in fixtures, a financing statement must be filed in the office where a mortgage on the real estate would be filed or recorded, in this case the Lake County Recorder's Office. Ind. Code § 26–1–9–401(1)(b). In order to perfect a security interest in equipment, a financing statement must be filed in the office of the Indiana Secretary of State. Ind.Code § 26–1–9–401(1)(c). If the items presently in dispute are fixtures, Loxas, having filed a financing statement in the Lake County Recorder's Office, had a perfected security interest. On the other hand, if the items are equipment, having failed to file with the Indiana Secretary of State, Loxas' security interest was unperfected. Pursuant to 11 U.S.C. § 544, his unperfected security interest would be inferior to the interest of Bernacchi as a hypothetical lien creditor.[3] By

---

1. The supermarket which Loxas sold to Bernacchi is located at 504—165th Street, Hammond, Indiana. The court will refer to this supermarket as the "Hammond Store", although Loxas operates other markets in Hammond that are not relevant to this proceeding.

2. An involuntary petition under Chapter 7 was filed on June 27, 1990. Upon Bernacchi's motion, the case was converted to a Chapter 11 proceeding by order entered June 29, 1990.

3. Section 544 gives the trustee the rights of a creditor with a judicial lien on property of the estate as of the date of the petition. 11 U.S.C. § 544(a)(1). In turn, § 1107 gives a debtor-in-possession all the rights and powers of the trustee (other than the right to compensation). 11 U.S.C. § 1107(a).

its December 10, 1992 decision and order, this court found that none of the items of personal property were fixtures, and accordingly, Loxas was not entitled to the $322,000 he had received. The District Court found that the bankruptcy court did not have sufficient facts to make such a finding, and remanded the matter for a further determination of whether any of the subject items were fixtures.

The parties have since stipulated to the nature of certain disputed items, and to the value of both the disputed and undisputed items. The parties continue to disagree whether the following items, with an aggregate value of $231,525.64, are equipment or fixtures:

One baler

Electronic Scale

Two Hussman upright triple decker

One Hussman 24′ service deli case

Three Hussman 12′ service meat cases

Two Hussman 8′ service meat cases

One dual temp Hussman 12′ service case

Two medium temp Hussman 12″ self service cases

One 7′ × 36″ three well sink with drain board

One 20″ × 18″ hand wash sink

One conveyor belt

Six checkout counters

One stainless steel sink (produce room)

All 48′ wall produce cases

Approximately 34′ island refrigerator produce case

One open face egg case

One 72′ dairy case

Approximately 36′ of freezer cases with end cases

Approximately 68.7′ of upright freezers

All shelving in store

All conveyor systems in store

One 3M message repeater

One 3M Cantata music stereo

One paging system

Telephone system with intercom

[Plaintiff's exhibit 1.] [4]

### Discussion

 In determining the character of the disputed items the bankruptcy court must apply Indiana fixture law. *In re TCI, Ltd.*, 769 F.2d 441, 448 (7th Cir.1985) citing *Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979). A fixture is "a thing that originally was a chattel, but has become a part of real estate by reason of attachment thereto by one having an interest therein." *Ochs v. Tilton*, 181 Ind. 81, 103 N.E. 837, 838 (1914). The parties agree that Indiana courts use a three part test to determine if personal property has become a fixture. The pertinent test requires "the united application of the following requisites:

(1) Annexation of the article, which may be either actual or constructive;

(2) adaption to the use of the realty or part thereof with which the article is connected;

(3) the party annexing must have intended thereby to make the article a permanent accession to the freehold."

*Id.* (citations omitted). Whether a particular item has become a fixture depends on the circumstances of the case and is a mixed question of fact and law. *Id.*

 While the parties agree on the test which is to be used, they disagree on the interpretation of the third factor, intent. Loxas argued that it is his intent as the annexing party which controls while Bernacchi and the Bank argued that it is Bernacchi's intent that controls. The court concludes that it is Loxas' intent which is relevant. The Indiana Supreme Court clearly stated that in order to become a fixture "the party annexing must have intended" to permanently annex the item to the realty. *Ochs v. Tilton*, 103 N.E. at 838. In *Ochs v. Tilton* the plaintiff sold a tobacco farm to the defendant. Stakes used for drying tobacco were located on the real estate. The plaintiff/sell-

4. The parties filed stipulations on November 2, 1993, and March 14, 1994. At the hearing on remand the Bank conceded that the alarm system was a fixture. [Tr. 95.] Loxas agreed that five four-foot dunnage racks, a pressure washer, dump freezer, four-foot dunnage rack, SS rack in freezer, and a three-sided stove were equipment. [Tr. 10.]

er contended the stakes were personal property while the defendant/buyer claimed they were fixtures which were transferred with the real estate. The court found the stakes were personal property, concluding that the evidence did not show that plaintiff/seller had intended the stakes become fixtures when he placed them on the land. Likewise, in *Citizens Bank of Michigan City v. Hansom*, 497 N.E.2d 581 (Ind.Ct.App.1986), the court considered the intent of the annexing party. Hansom purchased a sectional home, granting Citizens Bank a purchase money security interest which was noted on the certificate of title. One year later Hansom purchased the property on which the home sat, placed the home on a foundation, and excavated a basement under part of the home. Hansom subsequently sold the property to the Thodes and the bank filed suit for possession of the home. The court found that the bank's security interest was unperfected because the home had become a fixture. The evidence showed that the home was annexed and adapted to the use of the land, and that Hansom intended it to be a permanent annexation. The court made this finding even though the home was personal property at the time the security interest attached, and it was approximately a year before Hansom annexed the property to the land. In *Menzenberger v. American State Bank*, 101 Ind. App. 600, 198 N.E. 819 (1935) the court decided a dispute between a homeowner and the party who had furnished and installed grillwork, drapery rods, and draperies in the home. The court considered the homeowner's intent. *Lau v. Indiana National Bank*, 506 N.E.2d 70 (Ind.Ct.App.1987), presented a dispute between a purchaser of real estate and creditors of the prior owner. The court stated that "(w)hether the attaching party intended [a] pump to be a permanent accession" was to be determined by looking at several factors including "objective actions of the attaching party." *Id.* at 71. The *Ochs v. Tilton, Hansom, Menzenberger* and *Lau*

courts, all under different circumstances, have focused on the intent of the annexing party. Considering the language of the test articulated in *Ochs v. Tilton* and quoted in subsequent cases, and the application of this prong of the test by Indiana courts, the court finds it is Loxas' intent as the annexing party that is germane to the analysis.

■ Of the three test factors, intent of the annexing party is the most significant. However, the test is objective rather than subjective. "(T)he intention which controls is not the mere secret or undisclosed intention of the annexor but rather the intention to be inferred from all the circumstances of the annexation." *Peed v. Bennett*, 114 Ind.App. 412, 52 N.E.2d 629, 631 (1944) (citations omitted). Intention may be inferred from the nature of the article annexed, relation of the party making the annexation, the mode of annexation, and the purpose for which the annexation has been made. *Id.; Citizens Bank v. Mergenthaler Linotype Co.*, 216 Ind. 573, 25 N.E.2d 444, 448 (1940).

■ The item must be adapted to the use of the realty. Under the "institution doctrine" noted in *Citizens Bank v. Mergenthaler Linotype Co.*, 25 N.E.2d at 449, the question is whether the item of personal property is essential to the completeness of the real property in view of the intended use of that realty. In other words, removing a fixture must "disorganize and disable the plant of which it is a part." *Id.*

■ Annexation is the least significant factor of the test. The annexation may be actual or constructive.[5] A particular manner of annexation does not compel a conclusion that an item of personal property is or is not a fixture. In *Peed v. Bennett* the court explained:

> The manner of annexation is not alone controlling in determining the question for such annexation may be constructive as well as actual. So it appears that if an

5. Actual annexation "includes every movement by which a chattel is joined or united to the property; constructive annexation is the union of such things as have been holden parcel of the realty, but which are not actually annexed, fixed, or fastened to the property." Black's Law Dictionary 88 (6th ed. 1990). In other words,

"(c)onstructive annexation may be found where the objects, although not themselves attached to the realty, comprise a necessary, integral or working part of some other object which is attached." *In re Merrick*, 151 B.R. 260, 261 (Bankr.D.Idaho 1993) (citations omitted) (interpreting Idaho law).

article is adapted for attachment to the realty and there is an intent to dedicate it thereto no restraint on its mobility other than the will of the owner is required. *Id.* 52 N.E.2d at 631.

Applying the test in the present case, of the items in dispute the court finds the baler, electronic scale, conveyor belt and conveyor system, three sinks, and refrigeration/freezer units [6] are fixtures; the check-out counters, shelving, message repeater, paging system, music system, telephone system, and 72' dairy case are personal property.

Loxas testified that in 1978 or 1979 he purchased an abandoned building, made alterations and additions to the building, and equipped the building for use as a retail supermarket. He began operating the Hammond Store at this location in 1980. The business was profitable and he had no intention of selling until he was approached by an agent of Bernacchi's. He eventually agreed to sell the business, and under the terms of the purchase agreement Bernacchi was obligated to continue operating the supermarket. Loxas testified that the neighborhood where the Hammond Store was located needed a grocery store, and he felt obligated to make sure the building remained a grocery store. [Tr. 51.] The Loxas/Bernacchi purchase agreement stated that the Hammond Store was not to be used for any purpose other than a supermarket, [Purchase Agreement at 9, para. 17], and contained a non-competition clause wherein Loxas agreed not to operate a supermarket within a certain area in close proximity to the Hammond Store. [*Id.* at 11, para. 21.] Although it is clear that at the time of the sale both parties intended that a grocery store would operate on the real estate, and items included in the purchase are commonly used in the grocery business, it does not follow that every item located on the

property was intended as a fixture. For example, in *Citizens Bank v. Mergenthaler Linotype Co.,* 25 N.E.2d 444, the court found that two linotype machines located at a printing company were not fixtures. Although the machines were used exclusively in the printing process they were not bolted to the floor, were easily removable, and "were not an integral part of the plant, the removal of which prevented the other machinery and the plant as a whole from functioning properly." *Id.* at 449.

Loxas, Don Bernacchi, and Brent Semple ("Semple") each testified regarding the disputed items. Don Bernacchi is president of Bernacchi's. Semple is an auctioneer specializing in the supermarket and food industry, and was employed to sell the property located at the Hammond Store.[7]

*Baler* This item is a hydraulic electric baler used in the supermarket industry to compact cardboard boxes. It was attached to the building by an electric wire. In order to accommodate the 10–foot baler a hole was cut in the ceiling large enough for the 8–inch hydraulic cylinder. The roof remained intact. According to Loxas, the baler was necessary because there was not enough space to install an incinerator or store the boxes. The baler was affixed to the realty, and was necessary in the operation of this particular grocery store. The building was altered so that the baler could be installed. The court concludes that Loxas intended the baler to be permanently attached to the real estate.

*Electronic Scale* The electronic scale was used to weigh meat as it was delivered to the supermarket. Semple testified that the scale is portable and is plugged into a 110 socket. However, it appears the scale is

---

6. The refrigerator/freezer units include:
two Hussman upright triple decker
one Hussman 24' service deli case
three Hussman 12' service meat cases
two Hussman 8' service meat cases
one dual temp Hussman 12' service case
two medium temp Hussman 12' self service cases
all 48' wall produce cases
approximately 34' island refrigerator produce case
one open face egg case
approximately 36' of freezer cases with end cases
approximately 68.7' of upright freezers

7. Semple is employed with the auction firm of Seigarth, Semple & Associates, Williamsburg, Ohio, and has 20 years experience conducting auctions in 13 states.

connected to a kind of pulley system. According to Loxas "you have a rail where you hook your meat when you bring it to the back door. Then you roll it on this hook; and you bring it on this piece of rail, which is attached to the roof of the building; and there's a piece that big that is cut where this will stand and just goes up and down. Then you had to go through the ceiling, down the wall the other way; and the box that would show you what weight this product was was attached to the wall of the building." [Tr. 55.] While removing the scale may not interfere with the transporting function of the rail system, it appears that as a practical matter in order for the scale to be functional it had to be attached to the rail system so that the meat, weighing hundreds of pounds, could be passed over the scale. Loxas attached the scale to the wall and to the rail system, and the court concludes it was his intention to permanently affix the scale to the building.

■ *Conveyor belt and conveyor system* The parties list as disputed 1 "conveyor belt" valued at $216.84 and "all conveyor systems in store" valued at $37,946.13. Semple described the conveyor belt as a plug-in unit which conveyed meat from the weighing/wrapping area to a receiving area. [Tr. 30.] Bernacchi testified that the conveyor system was comprised of 12–foot sections and could be easily moved. [Tr. 44.] Loxas described a conveyor system which ran through a tunnel from the first floor to the basement transporting empty bottles for storage. The tunnel was constructed specifically for the conveyor system and was built by Loxas. [Tr. 52.] In addition there was a conveyor which carried deliveries from the unloading zone to a storage area. [Tr. 52–53.][8] From the limited testimony it appears the conveyor belt was an integral part of the conveyor system and that it was intended that the conveyor system be permanent.

■ *Three well sink, hand wash sink, and produce sink* The sinks were standard commercial stainless steel sinks, bolted to the wall. In order to remove the sinks the pipes connected to the water line had to be cut approximately six inches above the shut-off valve. [Tr. 29, 38, 56.] The court concludes that the sinks were affixed to the property, were essential to an operating water system, and were intended to be permanently attached to the building.

■ *Refrigeration/freezer cases* The refrigeration/freezer units were standard items apparently purchased from the Hussman company. The units were not bolted to the floor and needed no special foundation. [Tr. 27–31.] Each unit could fit through a door and could be removed by two men with the proper equipment. [Tr. 28–29.] No special equipment was needed to disconnect the units. [Tr. 29.] The store contained several compressors.[9] Each of the refrigeration/freezer units was attached to the compressors by copper tubing bolted to and running along the ceiling. [Tr. 64.] The compressors were also attached to the heating system. Heat from the units was distributed to the furnace, or, if not needed, to a roof-top condenser. [Tr. 67–68.] Loxas testified that relocating any given unit would require major remodeling and the piping would have to be re-configurated. [Tr. 65.] He also testified that, although a similar system could be found in other stores, he designed the system to meet the needs of the Hammond Store. [Tr. 67.]

■ Each refrigeration/freezer unit was an integral part of a cooling/heating system. Although any given unit could be removed without completely disrupting the entire system, it appears a unit of like kind would have to be substituted in order to maintain the system's effectiveness. Bernacchi and the Bank argue that the units were not custom built but were standard units offered for sale by catalog. Nevertheless, in order to become a fixture an item does not have to be unique or custom built for particular realty. For example, the court in *Peed v. Bennett,* 52 N.E.2d 629, found a standard electric refrigerator and gas stove became fixtures when placed in a rental unit. Bernacchi and the

---

**8.** Semple testified that he did not sell the conveyor that ran from the basement to the first floor. [Tr. 30.]

**9.** Semple testified there were ten compressors. [Tr. 37.] Loxas testified there were four compressors. [Tr. 67.]

Bank also argue that this court's decision in *Matter of Miller,* 63 B.R. 512 (Bankr. N.D.Ind.1986) should guide the present decision. In *Miller* the debtor owned a small grocery store. He purchased a portable walk-in cooler which he set up in the garage. A permanent walk-in cooler was located in the grocery store. The debtor planned to use the portable cooler when he was able to expand his business to additional locations. Until he expanded, he used the portable cooler in the special service he provided of processing game animals. Unlike the *Miller* debtor, Loxas intended the refrigeration/freezer units to remain in the Hammond Store for the life of the business. Moreover, these units were necessary to the operation of the supermarket and were not used for an incidental purpose.

The following items remained personal property:

■ *Check-out counters* Semple testified that the six check-out counters were wired to the nearest junction box but were easily movable as they were not bolted to the floor. [Tr. 30.] Bernacchi also testified that the counters were not bolted to the floor. [Tr. 42.] To the contrary, Loxas testified that for stability purposes each of the check-out counters was bolted to the floor. [Tr. 57–58.] Although the court is uncertain whether the check-out counters were actually affixed to the building, they did function independently of one another. Removing any one of the counters would not affect the operation of the store. The court concludes that there is not sufficient evidence to support an inference that Loxas intended to make the individual check-out counters fixtures.

■ *Shelving* The shelving consisted of standard four foot sections [Tr. 89] which were not bolted to the floor [Tr. 32]. It was, however, placed on the bare floor with linoleum or tile fitted around the base of the shelving. [Tr. 60.] There is no evidence that the shelving, even on the outside walls, was trimmed-out for aesthetic purposes. The shelving was easily dismantled and removed, and each section could stand on its own. The evidence does not establish an intent to permanently affix the shelving to the building.

■ *Message repeater, music system, paging system, and telephone system* The message repeater, music system, and paging system are standard plug-in units. Loxas testified that the three units were part of a communication system, each connected to an amplifier which in turn was connected to 28 speakers located throughout the store. [Tr. 61–62.] The amplifier and speakers are not in dispute. It appears that removing any one of the units would not interfere with the workings of the total communication system. While each of the units no doubt makes for a more efficient or pleasant operation, none are essential to the grocery business. Because they have neither been affixed to the building nor particularly adapted to the use of the building, the court cannot infer there was any intention to make them fixtures.

The telephone system had several stations and was connected to an intercom, [Tr. 33] but not connected to the speakers. [Tr. 62.] Each of the telephones could be removed or disconnected without interfering with the telephone system. Like the units discussed above, any given telephone was easily removable, not affixed to the building, and not particularly adapted to the use of the building. The court concludes there was no intention to make each instrument a fixture.

■ *Egg case* The egg case was a self-contained, plug-in refrigeration unit. It operated without additional tubing or wiring. [Tr. 31.] The court concludes that removing or relocating the egg case would not interfere with the use of the building, and can find no intent that it be permanently affixed to the building.

Those items of personal property which became fixtures have an aggregate value of $183,713.51. Loxas is entitled to retain this amount. The items which remained personal property have an aggregate value of $47,-812.13. Loxas must repay this amount to the bankruptcy estate. As previously noted, Loxas has stipulated that certain items with an aggregate value of $89,824.01 are not fixtures. Accordingly, plaintiffs are entitled to judgment in the amount of $137,636.14.

Bernacchi and the Bank ask that pre-judgment interest be awarded from July 22, 1991, the date the complaint was filed, to December 10, 1992, the date the court entered its original judgment in this matter. They also ask that post-judgment interest be awarded from December 10, 1992, until the judgment is paid.

■ Post-judgment interest is governed by 28 U.S.C. § 1961. Under § 1961(a) "(i)nterest shall be allowed on any money judgment in a civil case recovered in a district court." Because the bankruptcy court is a part of the district court, this section applies to judgments entered by a bankruptcy court. *Ocasek v. Manville Corp. Asbestos Disease Compensation Fund,* 956 F.2d 152, 154 (7th Cir.1992). The use of the word "shall" makes an award of post-judgment interest mandatory. *DeLong Equip. Co. v. Washington Mills Electro Minerals Corp.,* 997 F.2d 1340, 1341 (11th Cir.1993); *Wheeler v. John Deere Co.,* 986 F.2d 413, 415 (10th Cir.1993). The rate of post-judgment interest must be "equal to the coupon issue yield equivalent (as determined by the Secretary of the Treasury) of the average accepted auction price for the last auction of fifty-two week United States Treasury bills settled immediately prior to the date of judgment." 28 U.S.C. § 1961(a).

■ The parties disagree, however, on the relevant "date of judgment." Bernacchi and the Bank argue that the appropriate date is December 10, 1992, the date this court entered its pre-remand judgment. Loxas, on the other hand argues that the appropriate date should be the date of this order, entered post-remand. Post-judgment interest accrues when damages are "quantified in a final, appealable judgment." *Wheeler v. John Deere Co.,* 986 F.2d at 416 (citations omitted). The court's December 10, 1992 judgment, was a final judgment for purposes of appeal. Moreover, where "an initial quantified judgment is later decreased, interest runs from the date of the earlier quantified judgment but only on the amount ultimately allowed." *Id.* For example, in *Handgards, Inc. v. Ethicon, Inc.,* 743 F.2d 1282 (9th Cir.1984), *cert. denied,* 469 U.S. 1190, 105 S.Ct. 963, 83 L.Ed.2d 968 (1985), post-judgment interest was allowed from the initial date of judgment after the judgment was vacated and remanded for a new trial to determine liability and damages under a different standard of liability. The court, therefore, determines that post judgment interest will be awarded on $137,636.14, to begin accruing on December 10, 1992, at the rate of 3.72%, the interest rate in effect at that time, until the judgment is paid.

■ Section 1961 does not address the question of pre-judgment interest. Pre-judgment interest may be awarded to compensate more exactly for the lost use of money. Under federal law pre-judgment interest "is not recovered according to a rigid theory of compensation for money withheld, but is given in response to considerations of fairness. It is denied when its exaction would be inequitable." *Board of County Comm'rs of Jackson v. United States,* 308 U.S. 343, 352, 60 S.Ct. 285, 289, 84 L.Ed. 313 (1939). Unless there is a statutory provision to the contrary, the court has broad discretion in deciding whether to award pre-judgment interest. *Ambromovage v. United Mine Workers,* 726 F.2d 972, 982 (3d Cir. 1984). In the present case Bernacchi, being in severe financial straits, was anxious to obtain court approval to sell all its assets as quickly as possible. All the interested parties agreed that Bernacchi was in a desperate financial situation and it would be best to have the proposed sale go forward. The parties recognized that prior to the sale no one would have the opportunity to study the security agreement and determine the extent of Loxas' right, if any, to the sale proceeds. In order that the sale could proceed, the order authorizing the sale also authorized payment to Loxas, but preserved the right of interested parties to challenge the validity of Loxas' security interest and the amount of the sale proceeds paid to Loxas. At the time the sale was approved and at the time Loxas received the sale proceeds he understood that his claimed interest in the property was subject to attack and that he might have to return some or all of the proceeds to the estate. The rightful recipient of funds resulting from the sale of personal property has been denied use of those funds since

August 1990. On the other hand, Loxas has had the use of $137,636.14 since August 1990, even though he had no right in these funds. The court finds it would be equitable to award pre-judgment interest to the estate from July 22, 1991, the date when, by filing the adversary complaint, the first demand for return of the funds was made. Although 28 U.S.C. § 1961 does not set a standard for determining the rate of pre-judgment interest, the court will utilize the § 1961 measure for pre-judgment interest. *See In re Oil Spill by the Amoco Cadiz,* 954 F.2d 1279, 1330 (7th Cir.1992). Pre-judgment interest will be awarded from July 22, 1991, at the rate of 6.39%, the interest rate in effect on July 22, 1991.

Accordingly, judgment will be entered for plaintiffs in the amount of $137,636.14, with pre-judgment interest accruing from July 22, 1991, to December 10, 1992, at the rate of 6.39% per annum, and post-judgment interest at the rate of 3.72% per annum, accruing from December 10, 1992, until the judgment is paid. It is

SO ORDERED.