In re SHAROFF FOOD SERVICE, INC., Tax I.D. No. 84–0567119, Debtor.

H. Christopher CLARK, Trustee, Plaintiff,

v.

FRANK B. HALL & COMPANY OF COLORADO, Defendant.

Bankruptcy No. 89 B 09400 C. Adv. No. 92–1305 PAC.

United States Bankruptcy Court, D. Colorado.

March 20, 1995.

D. Bruce Coles, Denver, CO, for H. Christopher Clark, Chapter 7 Trustee.

Edwin G. Perlmutter, Denver, CO, for Frank B. Hall & Co. of Colorado.

## AMENDED OPINION AND ORDER ON MOTION FOR SUMMARY JUDGMENT

PATRICIA A. CLARK, Bankruptcy Judge.

This matter is before the Court upon the motion for summary judgment filed by H. Christopher Clark, Trustee (Trustee), the response thereto filed by Frank B. Hall & Company (Hall) and the Trustee's reply to the response.[1]

The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(F).

The relevant facts are as follows. Sharoff Food Service, Inc. (Debtor) was a food distribution and storage business which ceased business operations on May 26, 1989. On or about that date Sharoff Food Service, Inc.'s lender conducted a private foreclosure sale; it sold and otherwise transferred substantially all of the Debtor's assets. The foreclosure sale proceeds were insufficient to fully satisfy the Debtor's obligations. In fact, the Debtor had been insolvent for months prior to the sale.

On May 19, 1989, the Debtor's principals, Susan Fox and Garry Fox, were aware that the Debtor would permanently cease operations before the end of the month. As early as May 10, 1989, the principals agreed to request foreclosure by the lenders. The principals were also principals of a business which was one of the two buyers at the private foreclosure sale.

On July 12, 1989, an involuntary Chapter 7 petition was filed against the Debtor. Due to the filing of the petition, the 90 day prepetition preferential transfer avoidance period commenced April 13, 1989.

The Trustee anticipates that after all of the preferences and additional recoveries are made there will be approximately 15% available to pay general unsecured creditors.

Hall is a broker and agent for commercial insurance policies in Colorado. Early in 1988, the Debtor obtained four commercial policies to cover various risks associated with its food business. These policies are identified as follows:

1. Umbrella Policy No. CU1391506–00 (UP),

2. Business Automobile Policy No. BAT1391505–01 (BAP),

3. Commercial Package Policy No. TOP1391504–01 (CP), and

4. Boiler & Machinery Policy No. BM1316107–00 (BM).

All four of these policies were issued for a one-year period effective from May 1, 1988 through May 1, 1989. Under the terms of the insurance agreements between Hall and the Debtor, the premiums for coverage under the first three of these policies, the UP, BAP and CP, were to be paid by an initial down payment of 10% of the total annual premium followed by 11 monthly installments of the remaining 90% of that annual premium. Subsequently, the down payment for renewals was increased to 20%. The fourth of these policies, the Boiler & Machinery Policy, was to be paid in one lump sum at the start of the policy period.

In the fall of 1988, the Debtor obtained a fifth policy from Hall, Workmen's Compensation Policy No. WC1514533–00 (WC Policy). The WC Policy had a one-year term from October 1, 1988 to October 1, 1989. Its premium was payable with a 20% down payment to be followed by 8 monthly installments of the remaining 80% of annual premiums so that the policy was to have been fully paid more than three months before the end of its term.

Hall invoiced the debtor directly for the premiums in the month before they were payable. Hall had advanced premium pay-

---

1. This Opinion and Order was originally issued on December 19, 1994, however, due to the Court's concern regarding the inconsistency of certain figures, the parties were allowed to submit further information. In addition, the Trustee persuaded the Court to reconsider its subsequent new value analysis to exclude a post-petition refund. This Amended Opinion and Order supercedes the previous one and is a final Order.

ments on these policies to Zurich–American Insurance Company which is the actual insurer. In some instances, the Debtor's monthly installments were paid to Hall five to six months after Hall advanced the premium payments to Zurich–American for coverage of the Debtor.

During early January 1989, Hall met with the Debtor concerning its slow payment history and on January 23, 1989, Hall wrote to the Debtor requesting payment on its existing account balance of $147,225.86 with Hall.

During February and March 1989, the Debtor increased its payments to a total of $100,000, but it did not bring its balance current with Hall. By a check dated April 14, 1989, the Debtor paid an additional $10,000; the check was deposited on April 17, 1989.

On April 27, 1989, Hall met with the Debtor to discuss the payment of the past due balances and the renewal of the four original policies which were to expire May 1, 1989. An agreement was reached whereby the Debtor would pay $20,000 on Monday, May 1, 1989 and $20,000 each week thereafter through May 1989 to pay off the old policies as well as to apply a total of $40,000 down payment on the renewed policy premiums.

On April 28, 1989, Hall obtained approval from Zurich–American for these policy renewals and initial premium quotations. Hall issued a "provisional" bill to the Debtor for the 20% down payment on the four renewals to be effective May 1, 1989. On April 29, 1989 (effective May 1, 1989), Hall issued an insurance binder to renew the four policies.

On May 17, 1989, Hall provided the Debtor with certificates of insurance for the renewals effective May 1, 1989. On May 22, 1994, Hall issued and sent to the Debtor new invoices reflecting the higher deductibles elected by the Debtor. Each invoice references a "billing date" of May 22, 1989, but shows both the "transaction effective date" and "policy effective date" as retroactive to May 1, 1989 when the binders for renewal coverage on the 12 month policies became effective.

The following payments were made by the Debtor to Hall in May of 1989. A check dated April 28, 1989 for $20,000 was delivered to Hall on May 1 and deposited on May 2, 1989. A check for $20,000 dated May 5 was not received by Hall until May 12, 1989. A check for $20,000 dated May 12 was received by Hall on May 16, 1989. The final $20,000 check payment was dated May 18 and received by Hall on May 22, 1989.

Of the $80,000 paid in May of 1989, $60,000 was paid after May 10, 1989 when the Debtor's principals knew the business would terminate before the end of the month.

In total from April 17, 1989 through the final May 18, 1989 payment, which was during the preference period, the Debtor transferred $90,000 to Hall.

Along with the checks from the Debtor were the Debtor's notations which specified which invoices were being paid and the exact amounts to be paid on the specified invoice.[2] Hall applied the checks as it saw fit, notwithstanding the notations. Hall applied the $10,000 April 14 check to two invoices for non-WC Policy premiums dated January 4, 1989 and payable no later than February 1, 1989. The second check for $20,000 was applied $14,434 for past due premium installments on the WC Policy and $5,566 to two other past due installments on other policies of the Debtor.

The third check received by Hall on May 12, 1989 for $20,000 was applied to past due invoices for non-WC Policy premiums totalling $10,000. The remaining $10,000 was kept in reserve[3] by Hall pending final calculation of premiums on the four policies re-

2. Exhibits 20 and 22 to the Trustee's Memorandum Brief in Support of Summary Judgment contain a compilation of this material from the Debtor's vendor accounts' payable record and the F.B. Hall Ledger History Report. The exhibits demonstrate where the debtor requested that premium payments be applied and to which invoices Hall actually applied the payments. There are three $10,000 entries where the payments were not applied to any policy invoice, but rather were placed in reserve, i.e., placed in "Misc.".

3. Hall objects to the use of the word reserve and prefers to refer to the money which was set aside for the 1989–1990 policies as earned down payments.

newed May 1, 1989, and any adjustments or audit refunds from payments on the Debtor's WC policy.

The fourth check for $20,000 was received by Hall May 16, 1994. Ten thousand dollars was held in reserve, $7,433 was applied to past due WC installments and $2,567 was applied to past due monthly installments on two of the other policies.

The final check for $20,000 was received by Hall on May 22, 1989. Ten thousand dollars was held in reserve, $7,001 was applied to past due WC premium and $2,999 was applied to past due invoices on one of the other policies.

In sum, of the five payments which fell within the preference period, $30,000 was kept in reserve; $31,132 was applied to pay past due invoices for coverage under the four policies terminating May 1, 1989; and $28,868 was applied to pay past due installments owing on the WC Policy premiums. None of the monies were actually applied *pre-petition* to pay for any coverage on the policies renewed May 1, 1989. The application of the $30,000 down payment came approximately one year later.

In the nine months prior to May 1989, the highest one month total payment by the Debtor to Hall was $60,000 during February of 1989.

The parties agree that the net preference exposure through May 30, 1989 is $37,488.60. That figure eliminates the WC insurance coverage from the preference and subsequent value columns of the new value analysis.

Due to the foreclosure of the Debtor's assets, Hall agreed to Garry Fox's request to terminate the Debtor's coverage effective June 1, 1989 and to place coverage for Mr. Fox's new Fox Western company. None of the Debtor's payments or policy refunds were applied by Hall for the Fox Western coverage which commenced June 1, 1989.

After cancellation of the policies and during late June of 1989, Hall recalculated the premiums owed on all five of the Debtor's policies to reflect the pro rata premiums due for a 12 month period with policies terminating on June 1, 1989.

Almost one year after the Debtor's bankruptcy case commenced and without obtaining relief from the automatic stay, Hall applied the $30,000 held in reserve, together with the workmen's compensation premium refund of $18,840 [4] to satisfy premiums which were owing. The credits were applied by Hall as follows: $1,543 to satisfy premiums for WC Policy through June 1, 1989; $13,920.67 to satisfy premiums owed on the other four policies before renewal on May 1, 1989; $17,475 to satisfy premiums for coverage between May 1 and May 31, 1989 on the four renewal policies. Hall turned over the remaining $15,865.33 [5] in unapplied credits to the Trustee along with a letter dated June 7, 1990.

The Trustee concedes that the $28,868 applied pre-petition from the checks issued during the preference period to pay the workmen's compensation invoices would not be subject to avoidance as preferences under Section 547.[6] With the exception of the $28,868, the parties dispute the amount and extent of preferential payments made by the Debtor to Hall.

The Trustee asserts that except for the $28,868 for the workman's compensation the five transfers to Hall during the ninety days

---

**4.** Zurich–American audited the WC Policy in late 1989 and early 1990. The audit concluded the WC Policy generated a gross refund of $18,840 along with other prepayment and termination of employee adjustments to the original annual premium.

**5.** Using the above figures, the Court calculates that $15,901.33 should have been turned over, however, the parties stipulate that $15,865.33 was the amount.

**6.** The Trustee notes that "[a]pplicable case law indicates that debts owed for workmen's com-

pensation coverage are entitled to priority under 11 U.S.C. § 507(a)(4) and would therefore have been paid in full if funds were available from the bankruptcy estate had the pre-petition payment by the Debtor of those workmen's compensation invoices not been made. Otherwise, the Trustee's claims for these transfers were entirely reserved, including that for turnover as property of the estate the sum of $18,840 obtained post-petition for refund from the premiums paid pre-petition on the workmen's compensation policy and not otherwise avoided." Trustee's Memorandum Brief in Support of Summary Judgment, p. 7.

pre-petition are recoverable as preferences pursuant to 11 U.S.C. § 547(b). He maintains that Hall is a creditor because it advanced premiums for coverage to the Debtor, sent invoices to the Debtor, received payments from the Debtor and made the payment of the unused premium credit to the Trustee. The Trustee claims that the debts were antecedent and the Debtor was obligated to pay the full premiums in May of 1988 and May of 1989 *even if there was a monthly debt accrual feature.* Further, Hall applied the payments to invoices which were due long before the payments were made. Moreover, neither the April 17 or the May 1, 1989 pre-petition payments were applied to the down payment obligations for the renewal of insurance coverage. Not until the May 12, 1989 check did Hall hold a reserve for the obligations incurred May 1, 1989 on the renewed policies. The Trustee notes that Hall has received the payment of almost 100% of the debts owed to it by the Debtor, while the unsecured creditors will receive significantly less on their claims. Further, the transfers occurred while the debtor was insolvent. Based upon those claims and the fact that the transfers occurred within the 90 day period pre-petition, the Trustee seeks to recover $61,132 ($90,000-$28,868) from Hall in preferential transfers.

Furthermore, the Trustee argues that Hall violated the automatic stay through its post-petition application of the premium credits to the Debtor's existing debts without first obtaining relief from the automatic stay. He requests the turnover of $2,774.67 as the remaining premium refund due the Debtor.

Finally, the Trustee contends that none of the defenses in Section 547(c)(1) through (c)(4) apply in this case.

Hall maintains that it was entitled to advance the premiums and accept payments from the Debtor pursuant to the Agency Agreement with Zurich–American. Hall concurs with the Trustee that of the $60,000 paid in connection with the 1988 through April of 1989 policies, $28,868 for workmen's compensation coverage is not avoidable. However, Hall asserts that the $51,334 in insurance claims made by the Debtor after April 14, 1989 and paid by the insurer constituted subsequent new value which should be applied to eliminate any recovery of the remaining $31,132, in preferences for payments on the 1988 through April 1989 policies. In addition, Hall asserts that the $30,000 intended for the premium down payments on the 1989 through 1990 policies were contemporaneous exchanges of new value (payment submitted to Hall as agent for Zurich–American, in exchange for Zurich–American's obligation to indemnify the Debtor for losses and liabilities commencing May 1, 1989). Hall contends that Sharoff was only obligated to pay for the premium amounts that were earned. Payment was necessary to keep the policies in effect. Based upon those assertions, the Trustee would not be able to recover any of the alleged preferential payments to Hall.

Additionally, or alternatively, Hall maintains that in exchange for the $60,000 paid to it, the Debtor received "new credit" in the form of insurance coverage from April 14, 1989 through May 30, 1989 (when the policies were terminated). This new value calculation is the sum of the daily premium amounts,[7] rather than claims paid, plus the $15,865.33 refund resulting in Hall's alternative claim that only $3,463.17 would be avoidable. (*See* tables on page 10 of Defendant's Brief).

7. Hall asserts the following daily premium values:

| Policy Mo/Yr | Policy Type | Premium/Mo | Premium/Day |
|---|---|---|---|
| 5/88–4/89 | CU | $ 1,513.00 | $ 49.74 |
| 5/89–4/90 | CU | $ 1,925.00 | $ 63.28 |
| 5/88–4/89 | BAP | $ 7,617.00 | $250.39 |
| 5/89–4/90 | BAP | $10,205.00 | $335.47 |
| 5/88–4/89 | CP | $ 6,013.00 | $197.67 |
| 5/89–4/90 | CP | $ 5,142.00 | $169.03 |
| 5/88–4/89 | BM | $ 505.58 | $ 16.72 |
| 5/89–4/89 | BM | $ 220.00 | $ 7.23 |

As an additional alternative argument, Hall maintains that the earned premium for the four 1989 through 1990 policies and the WC policy equaled $17,492 and the unearned premium was $12,508. The unearned premium on the WC policy was $17,297. The total of unearned premiums is $29,805. From that sum, a refund of $15,865.33 was paid to the estate. Hall claims that the remaining $13,939.67 was applied to the Debtor's account under the doctrine of recoupment because it was merely recouping advance payments made by the Debtor. Hall argues that the advance deposit for services arises out of the same transaction as the provision of those services such that Hall is entitled to recoup the Debtor's account balance. Accordingly, Hall argues that it did not violate the automatic stay because recoupment, unlike set-off, is allowed without relief from the automatic stay.[8]

Finally, Hall claims that the estimated premium down payments were done in the ordinary course of business between the two entities and in the industry as a whole.

In order to grant summary judgment, the material submitted to the Court must " 'show that there is no genuine issue as to any material facts and that the moving party is entitled to judgment as a matter of law.' " *Leeling v. Smith (In re Leeling)*, 129 B.R. 637, 639 (Bankr.D.Colo.1991), citing Fed. R.Civ.P. 56(c). Summary judgment is not appropriate when there is a dispute over facts that might affect the suit's outcome under governing law. *Carey v. U.S. Postal Serv.*, 812 F.2d 621 (10th Cir.1987). The Court is required to review the record, pleadings and inferences in a light most favorable to the party opposing the motion. *E.g., Gray v. Phillips Petroleum Co.*, 858 F.2d 610, 613 (10th Cir.1988).

The parties have submitted numerous cases and made various arguments and alternative arguments in support of their respective positions on whether or what amount of preferential payments were received by Hall. The Court has reviewed the applicable statutes and relevant case authority.

The critical questions which must be answered so that the transfers are treated properly mirror 11 U.S.C. § 547(b) and (c)(1), (2) and (4).[9] The Court must deter-

---

8. Hall contends that the application of the $17,492 did not violate the automatic stay as it was earned at the time of the payment and therefore was not bankruptcy estate property.

9. 547(b) states:
   Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
   (1) to or for the benefit of a creditor;
   (2) for or on account of an antecedent debt owed by the debtor before such transfer was made:
   (3) made while the debtor was insolvent;
   (4) made—
   (A) on or within 90 days before the date of the filing of the petition; or
   (B) between 90 days and 1 year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
   (5) that enables such creditor to receive more than such creditor would receive if—
   (A) the case were a case under chapter 7 of this title;
   (B) the transfer had not been made; and
   (C) such creditor received payment of such debt to the extent provided by the provisions of this title.
   The relevant portions of 547(c) provide:

The trustee may not avoid under this section a transfer—
   (1) to the extent that such transfer was—
   (A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and
   (B) in fact a substantially contemporaneous exchange;
   (2) to the extent that such transfer was—
   (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
   (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
   (C) made according to ordinary business terms;
   (4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—
   (A) not secured by an otherwise unavoidable security interest; and
   (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor.

mine the following: which payments were made on account of an antecedent debt; whether any payments were contemporaneous exchanges for new value; whether and the amount of any new value was given by Hall to the Debtor; and whether Hall's postpetition application of the Debtor's premium credits violated the automatic stay. In making these determinations, the Court begins with the clearly established facts that Hall was a creditor, the transfers to Hall were for its benefit, made during the ninety days prepetition while the Debtor was insolvent and enabled Hall to receive more that it would have through the Chapter 7 liquidation process.

■ As for payments on account of an antecedent debt, it is clear that all of the payments were on account of an antecedent debt. In a Tenth Circuit decision, *Perma Pacific Properties v. Winn (In re Perma Pacific)*, 983 F.2d 964 (10th Cir.1992), the court reviewed cases which discussed the terms "debt", "antecedent debt" and "claim". It relied upon those cases which found that Congress intended for those terms to be construed "broadly and expansively". *Id.* In addition, it noted "that the terms 'debt' and 'claim' are coextensive: a creditor has a claim against the debtor; the debtor owes a debt to the creditor." *Id.* citing *Pennsylvania Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552, 558, 110 S.Ct. 2126, 2130, 109 L.Ed.2d 588 (1990). Hence, under the applicable law, the obligations were claims that arose before the payment and were antecedent debts.

### 1. Contemporaneous Exchange for New Value

■ Hall's first defense to the preferential payments is that they were intended to be a contemporaneous exchange for new value [10] given to the debtor; and the payments were a substantially contemporaneous exchange. At least one court which has addressed this question found that bringing an account cur-

rent and thereby "obtaining the right to do further business is not a contemporaneous exchange." *In re Dick Henley, Inc.*, 45 B.R. 693, 699 (Bankr.M.D.La.1985). There, similar to Sharoff Food's payments on the 1988 to May 1989 policies, the payments were on account of performance by the insurance company relating to an earlier period of time. Based upon the facts at hand and the rationale from the court in *Dick Henley*, the Court concludes that the payments on the 1988 to May 1989 policies were not contemporaneous exchanges for new value.

■ The treatment of the three $10,000 down payments for the May 1989 through April 1990 policies is a closer question. The issues are whether the down payments were in the nature of a credit transaction or had the quality of monthly debt accrual; and whether Hall gave new value for the transfers. The answer to the later question resolves this issue. The new policies became effective on May 1, 1989. The three $10,000 payments which Hall applied as down payments came after May 1, 1989. Although the Debtor was eventually entitled to a refund of part of that money since it exceeded the cost of the monthly premiums as determined by Hall, the obligation to pay the 20% down payment arose upon renewal. The Debtor and Hall agreed to terms for payment of the down payment of $10,000 per week in May, which is in the nature of a credit transaction. In sum, "a debt is incurred when a debtor first becomes legally bound to pay." *Bernstein v. RJL Leasing (In re White River Corp.)*, 799 F.2d 631, 632 (10th Cir.1986) (citations omitted). Thus, the Court is not persuaded by Hall's argument that the alleged down payments on the 1989 through 1990 policy have the quality of a monthly debt accrual similar to monthly lease payments. *See Lowrey v. U.P.G., Inc. (In re Robinson Bros. Drilling, Inc.)*, 877 F.2d 32 (10th Cir.1989).

---

**10.** Section 547(a)(2) defines "new value":

new value means money or money's worth in goods, services or new credit, or release by a transferee of property previously transferred to

such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation ...

Accordingly, the Court finds that none of the alleged preferences are saved on the basis of Section 547(c)(1) (contemporaneous or substantially contemporaneous exchange for new value defense).

## 2. Ordinary Course of Business

■ Hall raised a weak ordinary course of business defense under Section 547(c)(2). It has been established by the relevant case authority that a successful ordinary course of business defense requires proof that the transaction occurred in the ordinary course of business for the debtor, the creditor and the industry as a whole. *E.g., Clark v. Balcor Real Estate (In re Meridith Hoffman Partners),* 12 F.3d 1549, 1553 (10th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2677, 129 L.Ed.2d 812 (1994); *Miniscribe Corp. v. Keymarc, Inc. (In re Miniscribe Corp.),* 123 B.R. 86, 93 (Bankr.D.Colo.1991). Furthermore, the defense is limited to excepting those "recurring customary credit transactions" from avoidance by the trustee. *Marathon Oil Co. v. Flatau (In re Craig Oil Co.),* 785 F.2d 1563, 1567 (11th Cir.1986).

■ Hall has not presented persuasive evidence by way of affidavits, case authority or otherwise that the method or timing of payments were in the ordinary course of business for the Debtor and the industry as a whole. Further, the evidence for its own ordinary course of business was meager at best. Moreover, it is apparent that after Hall contacted the Debtor regarding its past due premiums and renewal, that the payments were increased in both amount and number per month. Hence, the payments cannot be saved under Section 547(c)(2) (ordinary course of business defense).

## 3. Subsequent New Value

The final defense raised by Hall is that any payments which were not found to be contemporaneous exchanges for new value should be protected as transfers under Section 547(c)(4). Briefly, that requires a determination that after Hall received payment it gave subsequent new value to the benefit of the debtor.

■ In this jurisdiction, the courts follow the case of *Successor Committee v. Bergen Brunswig Drug Co. (In re Ladera Heights Community Hospital, Inc.),* 152 B.R. 964 (Bankr.C.D.Calif.1993), to determine the avoidance of preferential transfers based upon subsequent advances of new value. *E.g., Jobin v. McKay (In re M & L Business Machine Co., Inc.),* 155 B.R. 531, 539 (Bankr. D.Colo.1993), *aff'd* 164 B.R. 657 (D.Colo. 1994); *see Jobin v. Lalan (In re M & L Business Machine Co., Inc.),* 160 B.R. 851 (Bankr.D.Colo.1993), *aff'd* 167 B.R. 219 (D.Colo.1994) (same result). Under *Ladera,* each preferential transfer is avoidable until exceeded by subsequent advances of new value. If the amount of subsequent new value exceeds the preferential transfer, the defense is complete as to that transfer, but surplus new value cannot be applied against later preferential transfers.

■ The determination of what constitutes new value for the subsequent advance exception involves the consideration of the principal policy objectives underlying the preference provisions of the Code. "The first objective is to encourage creditors to continue extending credit to financially troubled entities while discouraging a panic-stricken race to the courthouse. Another related objective of this section is to promote equality of treatment among creditors." *In re Jet Florida System, Inc.,* 841 F.2d 1082, 1083 (11th Cir. 1988) (citations omitted).

■ In addition, when resolving whether new value was given, the Court must find that the value of the Debtor's estate was enhanced by what Hall did subsequent to the Debtor's payments. *Id.* at 1084. Most Courts do not consider forbearance from terminating an agreement such as a lease or insurance as new value. *Id.* (Air Florida did not use the leased property and the lease was a financial drain on the estate.); *Drabkin v. A.I. Credit Corp. (In re Auto–Train Corp.),* 800 F.2d 1153, 1158–1159 (D.C.Cir. 1986) (the case dealt with an insurance financing company which was secured by the unearned premiums. The court determined that an agreement by an undersecured creditor to forgo his right to foreclose on collateral by using his security as leverage to press

for payment on the unsecured portion of the debt could not be treated as new value without unfairly prejudicing general creditors.). Looking at this issue another way, at least one court has found that providing insurance coverage (versus forbearing from terminating the insurance) after the payment of delinquent insurance premiums is subsequent new value. *In re Dick Henley, Inc.*, 45 B.R. 693, 699 (Bankr.M.D.La.1985).

■ There is an additional question as to whether the $15,865.33 post-petition refund can be included in the subsequent new value analysis. There are two predominate reasons why courts do not apply Section 547(c)(4) to post-petition transfers. One reason is the reliance upon the specific language "to or for the benefit of the debtor" as an implication that the subsequent advances of new value are only those given prepetition, because any post-petition advances are given to the debtor's estate, not the debtor. *E.g., Bergquist v. Anderson–Greenwood Aviation (In re Bellanca Aircraft Corp.)*, 850 F.2d 1275, 1284 (8th Cir.1988) and cases cited therein. Another focus is on the policy behind the subsection:

> The general avoidance portion of the Bankruptcy Code was intended to 'facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor.' H.R.Rep. No. 595, 95th Cong., 1st Sess., reprinted in 1978 *U.S.Code Cong. & Admin.News*, 5787, 5963, 6138. Nevertheless, the subsequent advance rule, section 547(c)(4), 'was not enacted to ensure equitable treatment of creditors, *but rather is intended to encourage creditors to deal with troubled businesses.*' ... Id. *at 1280 (emphasis added).*

*See also, Wolinsky v. Central Vermont Teachers Credit Union (In re Ford)*, 98 B.R. 669 (Bankr.D.Vt.1989); *Kellman v. P.S.E. & G. (In re Jolly "N", Inc.)*, 122 B.R. 897 (Bankr.D.N.J.1991).

Based upon the reasoning of these cases and the Court's inability to find a case to the contrary, the $15,865.33 paid post-petition should not have been included in the subsequent new value calculation. Furthermore, by including it in the subsequent new value calculation and as a deduction from the Trustee's post-petition turnover claim, the creditor would receive a double credit for that amount.

■ Hall raises several subsequent new value scenarios. In one, the new value is the value of the additional days of coverage. In the other, the new value is the payment of the claims submitted to Hall during the preference period.

The Court finds that providing insurance did constitute new value. It was a benefit to the estate which is quantifiable in daily amounts. Although Hall did not actually apply the payments according to a daily formula, the reality is that new value was supplied on those premiums where money was due. Based upon the daily premium figures listed in the Hall brief which is supported by direct testimony of Patti Hollenbeck, it has been determined that from April 14, 1989 to May 30, 1989 the pro rata premiums were as follows: $14,262 for the BAP, $8,498 for the CP and $761 for the UP. From Hall's brief the figure of $474.49 is listed as the daily premium on the WC. The BM policy for 1988 through April 1989 was paid in full, hence, no new value was given by providing coverage which was paid for through April 30, 1989. Notwithstanding that the BM policy should have been paid in full for May 1989 through April 1990, in reality it was not. Hence, the daily premium figure of $7.62 will be added to determine new value in May of 1989.

Using the Trustee's analysis in full and Hall's analysis in part, the new value analysis, footnotes and assumptions is as follows:

| Transfer Date | Preference Amount | Subsequent New Value | Preference Exposure After New Value |
|---|---|---|---|
| 4/17/89 [11] (4/18–4/30) | $10,000 | $ 6,471.40 | $ 3,528.60 |
| 5/1/89 (5/1–5/12) | $ 5,666 [12] | $ 6,904.80 | $ 2,279.80 |
| 5/12/89 (5/13–5/16) | $20,000 | $ 2,301.60 | $19,978.20 |
| 5/16/89 (5/17–5/22) | $12,567 [13] | $ 3,452.40 | $29,092.80 |
| 5/22/89 (5/23–5/20) [15] | $12,999 [14] | $ 4,603.20 $32,637.97 | $37,488.60 |
| TOTALS | $61,132 | $23,733.40 | $37,488.60 |

The bottom line is that $37,488.60 was received in preference payments and is therefore recoverable.

The Court does not find merit in Hall's alternative argument that the payment of insurance claims constitutes new value. The payment of claims is a benefit from the coverage. It is the continuing coverage that provides the new value.

The Trustee's final claim is to recover the full workmen's compensation refund generated post-petition in the amount of $18,840 less the sum of $15,865.33 already received from Hall. The net claim for turnover is $2,774.67. At issue is whether Hall violated the automatic stay by setting-off the refund against existing debts or whether it was recoupment.

Set-off, as provided in Section 553, "grants a creditor the right 'to offset a mutual debt owing by such creditor to the debtor' so long as both debts arose before commencement of the bankruptcy action and are indeed mutual." *Davidovich v. Welton (In re Davidovich)*, 901 F.2d 1533, 1537 (10th Cir.1990). "This mutuality requirement mandates that the debts involved between the same parties standing in the same capacity ... The mutual debt need not, however, have arisen out of the same transaction in order for Set-off to be available under the statute." *Id.* (citations omitted).

On the other hand, recoupment permits "a creditor to offset a claim that 'arises from the same transaction as the debtor's claim,' without reliance on the set-off provisions and limitations of section 553. The rationale for this is that the creditor's claim is 'essentially a defense to the debtor's claim against the creditor rather than a mutual obligation, and the application of the limitations on Set-off in bankruptcy would be inequitable.'" *Id.* (citations omitted). The "same transaction" requirement is satisfied when the debts to be offset arise out of a single, integrated contract or similar transaction. *Id.*; *See In re B & L Oil Co.*, 782 F.2d 155, 157–58 (10th Cir.1986).

In the case at hand, Hall has a right to payment from the Debtor for the premiums that it advanced to Zurich–American. Hall used a portion of the WC Policy refund to set-off premiums on the other four policies and part was used to satisfy the remaining premium of $1,543 owed on the WC Policy through June 1, 1989. The Debtor's right to a refund arises out of the WC Policy and is owed by Zurich–American to the Debtor.

With the exception of the $1,543 owed for the WC Policy, the lack of mutuality in these obligations is evident. Hall applied part of the refund due to the Debtor on the WC

11. There does not appear to be any evidence of when this payment was actually received by Hall, so the Court used the date that the check was deposited. Since the new value given completely offsets the preference, this particular date of transfer is not critical.

12. $14,434 was applied to WC premium that Trustee concedes is unavoidable.

13. $7,433 was applied to WC premium that the Trustee conceded is unavoidable.

14. $7,001 was applied to WC premium that the Trustee conceded is unavoidable.

15. The policies were cancelled effective June 1, 1989; therefore, new value was provided through May 30, 1989.

Policy to the outstanding premiums owing on different policies. Therefore, Hall's actions with respect to those applications were in the nature of set-off, not recoupment and were done in violation of the automatic stay.

■ The Court finds that the application of the $1,543 for the WC Policy also was not in the nature of recoupment. Hall is an independent insurance broker which serves as agent of Zurich–American, the Debtor is not a creditor of the agency; it is Zurich–American who owes the refund and Hall simply acts as a conduit for delivery of that refund to the Debtor. *See Reinhardt's Agency v. H. Wolfe Iron & Metal Co. (In re H. Wolfe Iron & Metal Co.)*, 64 B.R. 754 (Bankr.W.D.Pa.1989). Accordingly, the Trustee is entitled to recover the entire amount of the offset of $2,774.67.

Counsel for both parties used a pervasive approach to the arguments and issues. Therefore, to the extent that an argument was not addressed, the Court concludes that it was unnecessary or inapposite for the resolution of this case.

Based upon the preceding, the Trustee is entitled to recover from Hall the amount of $37,488.60 for preferential transfers and $2,774.67 for the turnover of property of the estate.

ORDERED that judgment shall enter against Hall in the amount of $37,488.60 for preferential transfers from the Debtor which shall be paid to the Trustee.

FURTHER ORDERED that judgment shall enter against Hall on the $2,774.67 claim for turnover and the sum shall be paid to the Trustee.

