**In re SCHWINN BICYCLE CO., et al., Debtors.**

**SCHWINN PLAN COMMITTEE, Plaintiff,**

**v.**

**AFS CYCLE & CO., LTD., et al., Defendants.**

Bankruptcy Nos. 92 B 22474 through 92 B 22482.

Adversary No. 94 A 01618.

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

March 7, 1997.

Howard Feller and Dion Hayes of McGuire Woods Battle & Boothe, Richmond, VA, and Mark K. Thomas of Katten Muchin & Zavis, Chicago, IL, for Plaintiff.

Duane L. Coleman, St. Louis, MO, and Bruce L. Wald and Diane J. Silverberg, Chicago, IL, for Defendants.

## *FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING TRIAL OF COMMITTEE'S PREFERENCE CLAIM AGAINST DEFENDANT TRUE FITNESS TECHNOLOGY, INC.*

JACK B. SCHMETTERER, Bankruptcy Judge.

The following Findings of Fact and Conclusions of Law are now made and entered following trial of a preference claim asserted by the Schwinn Plan Committee against Defendant True Fitness Technology, Inc. (the "Defendant" or "True Fitness") and final argument presented by the parties in writing:

### *FINDINGS OF FACT*

#### *Background and Preference Payments*

1. On October 7, 1992 (the "Petition Date"), Schwinn Bicycle Company and eight of its subsidiaries (collectively, the "Debtors" or "Schwinn") filed petitions for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.* (the "Code"). The subsidiaries of Schwinn Bicycle Company that filed for bankruptcy relief were

Schwinn Sales West Inc., Schwinn Sales Midwest Inc., Schwinn Sales East Inc., Paramount Design Group Inc., Excelsior Fitness Equipment Co., Schwinn Bicycle Co. Limited, Frontline Technology Incorporated, and Washington Manufacturing Company.

2. By Order of this Court dated December 22, 1993, the estates of Schwinn Bicycle Company and its subsidiaries were substantively consolidated.

3. Plaintiff, the Schwinn Plan Committee (the "Committee"), was established pursuant to Article IX of the Second Amended Joint Liquidating Plan, which was confirmed by the Court on January 6, 1994. The Committee is authorized to prosecute any proceedings which could be brought on behalf of the Debtors or the Debtors' estate to recover any transfers to which the Debtors might be entitled under the Code.

4. On October 3, 1994, the Committee filed four separate Adversary Complaints (of which the above-referenced is one), seeking to avoid and recover alleged preferential transfers under §§ 547 and 550 of the Bankruptcy Code, Title 11 U.S.C. In this Adversary proceeding, the Committee sued 48 defendants, including True Fitness Technology, Inc. ("True Fitness"). The Committee alleges that 33 payments totaling $313,357.73 were made by the Debtors to True Fitness during the 90–day period immediately preceding the Petition Date (the "Preference Period"). The Committee counsel demanded return of that sum by letter to True Fitness on July 13, 1994.

5. Certain issues common to all defendants were severed for trial and tried. Incorporated herein by this reference in their entirety are the Findings of Fact and Conclusions of Law contained in the Order Regarding Common Issues Trial and accompanying Findings of Fact and Conclusions of Law on Bifurcated Common Issues, all entered in this Adversary on February 8, 1996, *In re Schwinn Bicycle Co.,* 192 B.R. 477 (Bankr.N.D.Ill.1996) (the "Common Issues Opinion"). Findings and Conclusions in the Common Issues Opinion are binding on all parties in this adversary proceeding, including this Defendant True Fitness.

6. The Defendant is a Missouri corporation which, at all relevant times, has been in the business of producing and selling exercise treadmills for home use and treadmill parts.

7. During the 90 days before the Petition Date and for some time earlier than that starting in 1989, Defendant sold treadmills and parts separately to Schwinn Bicycle Co., the parent corporation, and to four subsidiary corporations: Schwinn Sales Midwest, Inc.; Schwinn Sales West, Inc.; Schwinn Sales East, Inc.; and Excelsior Fitness Equipment Co.

8. Based on the evidence presented at trial, the Common Issues Trial, and at the trial as to defenses of True Fitness, it is found (and was not here contested by Defendant) that the Committee has established each of the *prima facie* elements of a preference as to each of the transfers under § 547(b). This evidence consisted of the testimony of Mr. Gary Thorholm, Schwinn Bicycle Co.'s former Manager of Treasury, and Mr. David Bart of The Grabscheid Group, the Committee's trial exhibits, and evidence leading to the Findings contained in the Common Issues Opinion. The amounts and dates of payments to True Fitness that comprise the transfers in question under § 547(b) total $313,357.73 paid during the 90–days before bankruptcy was filed. Those were set forth in a summary chart admitted into evidence at trial as Plaintiff's Exhibit 1.

9. Defenses which Defendant asserts to the Committee's preference claim are the subsequent new value defense under § 547(c)(4) of the Code and the ordinary course of business defense under § 547(c)(2). The Committee contends that the Defendant at trial failed to prove either a subsequent new value defense or an ordinary course of business defense to any portion of the Committee's preference claim.

### Business Relationship Between the Parties

10. True Fitness's only plant was at all times mentioned here located in O'Fallon, Missouri. Larry J. Stallings ("Stallings"), the President and Chief Operating Officer of True Fitness from January 1, 1992, to early

1995, testified that at all relevant times True Fitness has been in the business of manufacturing and selling "high end" or expensive exercise treadmills for the home market. These treadmills retailed for between $2,000 and $3,500, and differed from less expensive treadmills in the quality and size of the motor, the size of the treadmill itself, the type and quality of the belt and the deck, and the electronics involved in the treadmill. Stallings Tr., p. 4 (line 19)-p. 5 (line 20).

11. On August 17, 1989, True Fitness and Schwinn entered into an agreement whereby True Fitness began manufacturing and selling private label treadmills to authorized Schwinn dealers under the Schwinn trademark (the "Letter Agreement"). *See* Lamar Dep. Ex. 3, Att. 2. Paragraph 7 of the Letter Agreement provided:

> True Fitness Technology, Inc. will send invoices to Schwinn Accounts Payable Department in Chicago, Illinois once a week. Terms on those invoices will be net 30 days from date of shipment.

> The Schwinn Company in Chicago will rebill its Regional Distribution Centers. Schwinn's Regional Distribution Centers will invoice Authorized Schwinn Dealers.

12. Paragraph 7 of the Letter Agreement was modified by the parties on August 25, 1989, to provide that True Fitness would invoice each of the four Schwinn Distribution Centers directly instead of sending its invoices to the Schwinn Accounts Payable Department in Chicago. *See* Lamar Dep., Ex. 3, Att. 3. The "Distribution Centers" were actually subsidiaries of Schwinn Bicycle Company; namely, Schwinn Sales East, Inc., Schwinn Sales Midwest, Inc., Schwinn Sales West, Inc., and Schwinn Sales South, Inc.[1] The August 25, 1989, modification of the Letter Agreement also specified, "Terms of invoice will be net 30 days from date of shipment. Schwinn Bicycle Company will remain liable for payment." *Id.*

13. Schwinn and True Fitness operated under the Letter Agreement from August 1989 until the Petition Date. Kevin T. Lamar ("Lamar"), Schwinn's Group Product

Manager of Fitness, testified that during this approximately three-year period, True Fitness sold thousands of treadmills to the Debtors each year. *See* Def. Ex. 8, p. 43 (lines 8–10, 13–16).

14. In accordance with the Letter Agreement, True Fitness invoiced the Debtors on terms requiring payment within 30 days. *See* Def. Ex. 8, p. 43 (lines 4–7). Prior to the Preference Period, the Debtors did not pay True Fitness within 30 days. Rather, Debtors typically made payment 30 to 45 days after they were invoiced by True Fitness. *See* Def. Ex. 7.

15. Stallings testified that True Fitness did not compete in the lower end of the treadmill market and had only one competitor in the high-end market, to-wit, Precor. Stallings also testified that both True Fitness and Precor required payment from their respective dealers within 30 days. Stallings further testified that True Fitness is usually not paid by its dealers within the 30–day time frame. Instead, payment is normally made 30 to 45 days after invoicing.

16. In early 1992, Schwinn and True Fitness began discussing development of a new treadmill which True Fitness would build for Schwinn. According to Lamar, Schwinn desired a treadmill which would be different from the treadmill which True Fitness was selling under its own name, since Schwinn sold the same treadmill at a price $400 to $500 greater than True Fitness. *See* Def. Ex. 8, p. 29 (lines 7–17).

17. From early 1992 to the Petition Date, True Fitness worked with Schwinn in developing the new treadmill which Schwinn desired. Even during the Preference Period, the parties continued their joint efforts to develop this new treadmill. These efforts included visits by Lamar and other Schwinn representatives to True Fitness's plant in O'Fallon, Missouri. *See* Def. Ex. 8, p. 30 (line 22)-p. 31 (line 17).

18. In the summer of 1992, Schwinn began to experience serious financial problems.

---

**1.** Prior to the Petition Date, Schwinn Sales South, Inc. was closed and its operations were divided between Schwinn Sales East, Inc. and Schwinn Sales Midwest, Inc. *See* Def. Ex. 8, p. 25 (lines 2–11).

Gary E. Thorholm ("Thorholm"), Schwinn Bicycle Company's former assistant treasurer, testified that beginning in the summer of 1992, he took control of the operating accounts of Schwinn's affiliates. Specifically, the affiliates would prepare checks and send them to Thorholm, who would then decide whether the checks should be sent to vendors or held. In this manner, Schwinn Bicycle Company determined which vendors, including True Fitness, would be paid.

19. According to Lamar, Stallings periodically called him prior to and during the Preference Period to inquire about the status of Schwinn's financial condition. *See* Def. Ex. 8, p. 32 (line 1); p. 33 (line 8). Lamar provided Stallings with as much information as he knew, such that Schwinn was attempting to secure an infusion of investment capital. *Id.* at p. 37 (line 15)-p. 38 (line 1); p. 39 (lines 5–15). Lamar never told Stallings that Schwinn would be or may be filing bankruptcy in the near future. Both Lamar and Stallings were surprised when the filing occurred. *Id.* at p. 39 (lines 16–19).

20. Stallings testified that he first called Lamar to inquire about Schwinn's financial condition only several weeks before the Petition Date. During this conversation, Lamar confided in Stallings that Schwinn's finances were "getting very tight." Stallings expressed concern and stated he needed to know what was happening with Schwinn so he could protect True Fitness. As no time, however, did Stallings ever indicate to Lamar any forms of protection which True Fitness was considering. *See* Def. Ex. 8, p. 32 (line 16)p. 34 (line 14); p. 49 (line 24)-p. 50 (line 3).

21. Stallings never made an express threat as such to stop treadmill shipments by True Fitness to Schwinn, *see* Def. Ex. 8, p. 35 (lines 10–16); p. 38 (line 19)-p. 39 (line 4); p. 57 (lines 16–23), and True Fitness did continue to ship treadmills to Schwinn until the Petition Date. *See* Def. Ex. 8, pp. 44 (lines 11–16). However, during the 90 days prior to bankruptcy a stream of communications from True Fitness pressured for payments with the implication that further shipments would not otherwise be made. *See* Findings, Nos. 29–34, *infra.*

22. During the Preference Period, Schwinn made 33 payments to True Fitness totaling $313,357.73, and True Fitness shipped a substantial number of treadmills and parts to Schwinn, including many in the 10–day period immediately preceding the Petition Date. *See* Def. Exs. 1 and 2.

23. As of the Petition Date, Schwinn owed True Fitness $282,349.59 for treadmills and parts which Schwinn had ordered but not paid. Stallings, on behalf of True Fitness, filed proofs of claim with the Court, seeking to recover this amount. *See* Def. Ex. 6.

### Subsequent New Value Defense

24. With regard to its alleged subsequent new value defense, Defendant rested on unpaid invoices prepared by it and on certain summary charts which summarize the information contained on those invoices. Def. Exs. 1, 4, and 5. The Committee argues that the Defendant failed to prove that the alleged new value shipments were ever received by Debtors or their dealers or, if they were received, when they were received. This argument rests on the contention that Defendant did not introduce into evidence any shipping or transportation documents to prove that the goods referred to in the invoices were actually delivered to and received by the Debtors or their dealers. Further, the Committee argues that Defendant did not prove that any of the alleged new value shipments were received before the Petition Date. Defendant's invoices on their face do not expressly state whether or when the shipments were received by Debtors or their dealers. Def. Ex. 1. Without any shipping or transportation documents in evidence, argues the Committee, the Defendant did not prove that the goods were actually received by Debtors during the Preference Period, which is an essential element of the new value defense. Additionally, the Committee argues that Defendant's only witness (Mr. Larry Stallings, its President and Chief Operating Officer during 1992–1995) did not testify with certainty that all of the invoices for Defendant's alleged new value shipments remained unpaid, relying on his comment that, "[M]ost of these, they were not paid."

*See* Designated Portions of Transcript of Stallings' Trial Testimony ("Stallings Tr."), pp. 44 (lines 1, 16) and 45 (lines 1, 5). Such evidence, the Committee argues, does not support a finding that specific shipments asserted to be new value shipments remained unpaid as of the Petition Date. Plaintiff therefore contends that Defendant failed at trial to prove a subsequent new value defense as to any of the transfers.

25. Contrary to the Committee's argument, the Defendant did establish that True Fitness advanced a substantial amount of new value to Schwinn on an unsecured basis after it received the preference payments. The evidence further reflects that True Fitness was not paid by the Debtors for the new value advanced.

(a) Without objection from the Committee, True Fitness introduced into evidence a detailed "New Value Analysis" (Defendant's Exhibit 4) setting forth the date and amount of each preferential payment as well as the new value shipments which True Fitness subsequently sent to Debtors.

(b) True Fitness also submitted each of the 236 invoices reflecting the new value advanced by it to the Debtors during the Preference Period (Defendant's Exhibit 1). True Fitness also established *prima facie* (and without rebuttal) that the new value shipments were actually received by Schwinn. On cross-examination, Stallings was asked, "Do you know whether any of those shipments which were unpaid as of the petition date were received?" In response, Stallings stated, "I'm sure they were received because [True Fitness] paid the freight bills for shipping." *See* Stallings Tr. at p. 100 (lines 14–17).

(c) On behalf of True Fitness, Stallings also executed four proofs of claim for "goods sold" to the Debtors. *See* Def. Ex. 6. The goods which are the subject of the proofs of claim are the same goods which are the subject of True Fitness's new value defense. By signing the proofs of claim, Stallings represented to the Court that True Fitness was owed $282,349.59 for goods sold and delivered to Schwinn, a claim of debt that has not been contested

by the Committee except through assertion of the preference payments in this Adversary.

(d) Stallings and Lamar also testified that, within a day or two of the Petition Date, Schwinn and True Fitness were discussing a "payment schedule" for the amounts which Schwinn owed to True Fitness. *See* Pl.Ex. 39, p. 21 (lines 15–20); Pl.Ex. 41. These discussions would not have occurred had Schwinn not received the new value shipments.

(e) From this evidence, it may reasonably be inferred that Debtors received the treadmills and parts which are the subject of True Fitness's § 547(c)(4) defense. In the absence of any evidence to the contrary, it has thereby been established that all sales for which Defendant asserts a subsequent new value defense were actually shipped and delivered prepetition.

26. There is a further issue to be determined: Even though the alleged new value shipments were received by Debtors during the Preference Period, and they remained unpaid as of the Petition Date and may be set off against preferential transfers, does evidence support calculation of the Defendant's subsequent new value deduction on an individualized debtor-by-debtor basis, or should all debtors in the various related Schwinn bankruptcies be treated as one consolidated debtor as Defendant urges? Defendant sold treadmills and parts separately to Schwinn Bicycle Co., the parent corporation, and to four of its subsidiary corporations. According to the Defendant's sole witness, it received separate purchase orders from Schwinn Bicycle Co. and its various subsidiaries throughout the parties' commercial relationship. Stallings Tr., p. 9 (lines 1, 11–18). Under an agreement entered into by Schwinn Bicycle Co. and Defendant on August 18, 1989, as amended on August 25, 1989 (the "1989 Agreement"), Defendant sent separate invoices to each of the Debtors to which it made shipments. Def. Ex. 9. Defendant also maintained separate accounts for each of the Debtors and filed proofs of claim for unpaid shipments only against the particular Debtor whose name appeared on the unpaid invoices. Def. Ex. 6.

27. While Defendant contends that the 1989 Agreement made Schwinn Bicycle Co. liable for its subsidiaries' debts to the Defendant (*see* Def. Ex. 9), Mr. Thorholm, who was in charge of Schwinn Bicycle Co.'s payables, testified that he was unaware of any such guaranty or suretyship arrangement. Furthermore, the Defendant did not establish that the individual Schwinn subsidiaries were liable for their sister corporations' debts to the Defendant. According to Thorholm, each of the Debtors had always separately paid its own invoices received from the Defendant. Indeed, Mr. Stallings himself testified that each of the various Debtors had a different payment pattern with the Defendant. Stallings Tr., p. 42 (lines 8–23, 18–22). Since during the Preference Period Defendant dealt with each of the Debtors separately on separate accounts with no consolidated liability, it is consistent with that history to find the proper method of calculation for Defendant's alleged subsequent new value defense to be on an individualized, debtor-by-debtor basis.

28. The Committee is correct to dispute the amount of credit to which True Fitness is entitled under § 547(c)(4). True Fitness's new value analysis is flawed in the calculation it deduces from its sales to Debtors in that the analysis treats Debtors as a consolidated entity rather than separately. Despite the substantive consolidation of Debtors' estates, the new value advanced by True Fitness should be calculated on a debtor-by-debtor basis for reasons discussed in the Conclusions of Law. Calculation of True Fitness's new value defense on a debtor-by-debtor basis yields a result more favorable to the Committee, i.e., the preference liability of True Fitness is only reduced to $107,152.76, rather than $60,552.36 that would result if Debtors were treated for this purpose as one entity. *See* Def. Ex. 5. The difference stems from the fact that there is more excess new value, which cannot be used to offset later preferential transfers, when the Debtors are treated as separate entities. *See Brown v. Shell Canada, Ltd. (In re Tennessee Chemical Co.),* 159 B.R. 501, 516 (Bankr. E.D.Tenn.1993); *Clark v. Frank B. Hall & Co. of Colo. (In re Sharoff Food Service, Inc.),* 179 B.R. 669, 677 (Bankr.D.Colo.1995).

## Ordinary Course of Business Defense

29. With regard to Defendant's asserted ordinary course of business defense, the evidence to be considered starts with earlier Findings in the Common Issues Opinion. There it was found that Debtors were not operating in the Preference Period as they had previously because of their poor financial situation. Debtors experienced a severe cash crisis during the preference period and were unable to pay their payables as they came due in the ordinary course. Debtors had violated certain debt covenants in their loan agreements with their banks in early 1992. As a result, during the Preference Period, lenders were monitoring Debtors' borrowing base and periodically sweeping cash from the Debtors' operating accounts. Additionally, Debtors' sales, inventory levels, and accounts receivable all had decreased markedly during 1992, further restricting Debtors' borrowing base and their access to financing. All of these factors left the Debtors' during the Preference Period with insufficient cash to pay their vendors' outstanding invoices or with which to acquire new shipments of product.

30. Mr. Lamar was Schwinn Bicycle Co.'s group product manager for fitness during 1992. Lamar Dep. Tr.; Pl.Ex. 39, p. 6 (lines 19–22). Lamar's duties at Schwinn Bicycle Co. included product engineering and development and initial negotiation of pricing with the Debtors' fitness product vendors. Pl.Ex. 39, p. 7 (lines 1–6, 11–18). He did not normally become involved in delinquencies owing to the Debtors' vendors or other accounts payable issues. Pl.Ex. 39, p. 7 (line 11)-p. 8 (line 9); p. 15 (line 10)-p. 16 (line 4); p. 16 (lines 16–18); p. 27 (line 21)-p. 28 (line 4); p. 49 (lines 4–9); and p. 53 (lines 5–19).

31. However, Mr. Lamar testified that during the Preference Period he received weekly and twice-weekly telephone calls from Mr. Stallings, the Defendant's President. Pl. Ex. 39, p. 11 (lines 1–6); p. 13 (lines 5–10). During these telephone calls, Stallings indicated to Lamar that he was concerned about the Debtors' delinquent payments to the Defendant, about the financial condition of

Debtors, and "about continuing to ship products" to Debtors unless the Defendant was financially covered or protected. Pl. Ex. 39, p. 12 (lines 9–25). Based on his conversations with Stallings, Lamar knew that, "True was not shipping treadmills to Schwinn because of the large amount of debt that we owed True Fitness. And I knew that if we paid down our debt, they would release product." Pl.Ex. 39, p. 50 (lines 4–17). Because of these conversations with Stallings, Lamar talked to Ralph Murray, Schwinn Bicycle Co.'s President, and Thorholm about Lamar's concern that Defendant would not ship product to Debtors because of the large delinquency owed to the Defendant. Pl.Ex. 39, p. 13 (lines 11–17); p. 50 (lines 4–10). Lamar then worked with Murray and Thorholm on getting some amounts paid to the Defendant so that it would release product to the Debtors. Pl.Ex. 39, p. 13 (lines 11–17); p. 50 (lines 4–17). Mr. Lamar's conversations with Stallings were unusual because Lamar normally did not have discussions with anyone from the Defendant regarding amounts outstanding on Defendant's invoices. Pl.Ex. 39, p. 14 (lines 11–17); p. 15 (line 15)-p. 16 (line 4). In fact, before the Preference Period, Lamar did not involve himself at all with the payment of Defendant's invoices. Pl.Ex. 39, p. 13 (line 24)-p. 14 (line 3). Rather, before bankruptcy, Lamar "rarely" had discussions with the presidents of any of Debtors' vendors about amounts owing to those vendors. Pl.Ex. 38, p. 53 (lines 5–10).

32. Thorholm testified that he had discussions with Murray and Lamar after each of Lamar's telephone calls from Stallings. According to Thorholm, this was a departure from past practice, because Murray and Lamar normally did not become involved in payables issues at Schwinn Bicycle Co. Based on his discussions with Lamar and Murray, Thorholm testified that he was concerned that the Defendant would not ship anymore product to Debtors unless the Debtors sent some payments to the Defendant on the outstanding invoices. Debtors' payables situation during the Preference Period was very poor; most vendors were not being paid. According to Thorholm, collection calls on the part of a vendor could cause a vendor to get paid ahead of other vendors. This was a

period when the squeaky wheel did indeed get greased. As a result of his discussions with Lamar during the Preference Period, Thorholm caused the Debtors to send payments to the Defendant on outstanding invoices during the Preference Period in order to keep shipments coming from the Defendant. According to Thorholm, the payments were sent to Defendant because he understood that Defendant would not ship product to the Debtors unless they made payments on outstanding invoices.

33. Mr. Larry Stallings joined the Defendant in 1992, and the Defendant's finance, sales, manufacturing, and accounting departments all reported to him in his capacity as Defendant's President and Chief Operating Officer. Stallings Tr., p. 4 (line 18); p. 5 (line 24)-p. 6 (line 8). Stallings only "occasionally" became involved with contacting Defendant's customers regarding slow payment of invoices. Stallings Tr., p. 6 (lines 12–15). However, Stallings testified that, several weeks before the Preference Period, he became concerned about the delinquencies owing from the Debtors and called Lamar to inquire about Debtors' financial condition. Stallings Tr., p. 99 (lines 10–17). Stallings expressed his concern to Lamar and stated that he needed to know what was happening at the Debtors so that he could "protect" the Defendant. Stallings Tr., p. 100 (lines 1–5). In one of his calls to Lamar during the Preference Period, Stallings stated, "I have to protect my company, and I need a little more answers [sic] than just 'we're trying to restructure.'" Stallings Tr., p. 55 (lines 1–5). Indeed, toward the end of the Preference Period, Stallings stated explicitly in a letter to Debtors (which confirmed an earlier conversation which Lamar testified may have occurred as early as August 1992) that future shipments would be on pre-payment terms and contingent on Debtors' payment of outstanding invoices. Pl.Ex. 41; Pl.Ex. 39, p. 51 (line 16)-p. 52 (line 7).

34. In sum, the foregoing evidence demonstrated that the transfers were not made in the ordinary course of dealing between Debtors and the Defendant. Rather, the Defendant made telephone calls to the Debtors requesting payment of their outstanding

indebtedness and communicating to Debtors that new product would not be shipped unless at least some of the past due amounts were paid. These telephone calls from the Defendant to the Debtors were a departure from the prior course of dealing of the parties. Thus, the evidence showed that the payments were unusual in that they were different from the Debtors' prior payment practices, and they resulted from unusual collection efforts by the Defendant.

35. The Defendant also attempted to use Stallings as its witness to prove the third prong of the ordinary course of business defense, whether the transfers were made according to "ordinary business terms." 11 U.S.C. § 547(c)(2)(C). Stallings worked at the Defendant during 1992–1995 and has never worked for any other manufacturer of either exercise treadmills or other fitness equipment. Stallings Tr., p. 4 (line 18); p. 5 (lines 21–23); p. 91 (lines 16–19). Before joining Defendant in 1992, Stallings worked in the metals industry for about 25 years, and he is currently President and Chief Executive Officer of a company involved in the metals industry. Stallings Tr., p. 90 (line 20)-p. 91 (line 3). Stallings testified that there were 8 to 10 principal treadmill manufacturers in 1992 and specifically identified four manufacturers of home use treadmills in addition to the Defendant: Precor, Landis, Universal, and Spirit. Stallings Tr., p. 91 (lines 7–12); p. 67 (lines 8–18).

36. However, Stallings testified only as to the contractual payment terms offered to dealers by the Defendant and Precor. Stallings claimed that he gained familiarity with the contractual payment terms which Precor offered to its dealers through certain conversations he had with Precor dealers during his tenure at the Defendant. Stallings Tr., p. 74 (lines 1–11). As a result of his discussions with certain Precor dealers, Stallings asserted that Precor's contractual terms to its dealers for payment were 30 days after invoice, the same contractual terms offered by the Defendant. Stallings Tr., p. 75 (lines 6–13). Stallings' testimony on the ordinary business terms in the treadmill industry was based on and limited to only his purported familiarity with Precor's contractual terms. Thus, the Defendant did not present any evidence as to the contractual payment terms offered by any of the other manufacturers in the treadmill industry.

37. Moreover, Defendant presented no evidence as to the actual payment practices of Precor customers or those of any other treadmill companies. Stallings admitted that he did not discuss with any Precor dealers their payment practices with respect to Precor; therefore, he has no knowledge regarding the actual payment practices of any Precor dealers. Stallings Tr., p. 76 (line 23)-p. 77 (line 5); p. 78 (lines 12–21); p. 79 (lines 10–22); p. 81 (lines 1–10). Stallings further admitted that he did not review any Precor dealers' records regarding their payment practices relating to Precor. Stallings Tr., p. 89 (lines 6–10). Nor did Stallings ever have any discussions about the payment practices of Precor's customers with any representative of Precor. Stallings Tr., p. 90 (lines 4–7).

38. Additionally, the Defendant did not present any evidence as to collection practices of Precor or any other treadmill manufacturer. Stallings did not discuss with any Precor dealers the collection practices of Precor and, therefore, has no knowledge of its collection practices. Stallings Tr., p. 76 (line 23)-p. 77 (line 5). Nor did Stallings ever have discussions about Precor's collection practices with any representative of Precor. Stallings Tr., p. 90 (lines 4–7).

39. It must be and is found that Stallings lacks personal, first-hand knowledge about ordinary business terms and practices in the treadmill industry in general. He has no knowledge of the contractual payment terms of most companies in the treadmill industry, no knowledge of the actual payment practices of customers of any treadmill companies other than the Defendant itself, and no knowledge of the collection practices of any treadmill companies other than the Defendant. Stallings never worked for any manufacturer of treadmills or exercise equipment other than the Defendant, and he acknowledged that his entire understanding of Precor's contractual payment terms with its dealers is based solely on conversations he had with Precor dealers during the 3 to 4 years he

worked for the Defendant. Thus, the Defendant failed to present credible evidence sufficient to establish the defense element of ordinary business terms under § 547(c)(2)(C).

40. No matter how denominated, any findings of fact contained herein or below shall operate as Findings of Fact, and any conclusions of law contained herein or below shall operate as Conclusions of Law.

### CONCLUSIONS OF LAW

Since the Committee established each of the *prima facie* elements of a preference under § 547(b) as to each of the transfers, the burden shifted to Defendant to prove its affirmative defenses, subsequent new value, and ordinary course of business. 11 U.S.C. §§ 547(c)(2) and (4) and 547(g).

Section 547(c)(4) provides that the trustee may not avoid as a preferential transfer any transfer:

> to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—
>
> (A) not secured by an otherwise unavoidable security interest; and
>
> (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor.

11 U.S.C. § 547(c)(4). Under the new value defense, the preference defendant "has the burden of establishing that new value was extended, which remains unsecured and unpaid after the preferential transfer." *Matter of Prescott*, 805 F.2d 719, 731 (7th Cir.1986).

#### New Value Defense

■■■ For a preferential transfer to be excepted from avoidance under § 547(c)(4), the following order of events must have occurred:

(1) The creditor must have received a transfer which is otherwise voidable as a preference under § 547(b);

(2) After receiving the preferential transfer, the preferred creditor must advance additional credit to the debtor on an unsecured basis; and

(3) That additional post-preference unsecured credit must remain unpaid as of the date of the bankruptcy petition.

*Chaitman v. Paisano Auto. Liquids, Inc. (In re Almarc Mfg., Inc.)*, 62 B.R. 684, 686 (Bankr.N.D.Ill.1986). If those three elements are satisfied, the creditor may set off the amounts of the post-preference unsecured credit which remains unpaid as of the petition date against the amounts which the creditor is required to return to the trustee on account of the preferential transfer. *Id.*

■■■ The general rules regarding the calculation of subsequent new value under § 547(c)(4) are well-established. For the purpose of the affirmative defenses under § 547(c), when the debtor's payment is made by check, like the transfers in this case, the preferential transfer is deemed to occur on the date that the creditor received the debtor's check. *See In re Peter Lee*, 108 F.3d 239 (9th Cir.1997) (collecting cases); *Chaitman*, 62 B.R. at 688. In determining when new value has been given to the debtor in a case where the creditor provided goods to the debtor, the new value is deemed to have been given when the goods are actually delivered to the debtor, rather than when the creditor chooses to calculate the price of the goods or to bill for them. *Bash v. American Tool Cos., Inc. (In re George Worthington Co.)*, 163 B.R. 115, 118 (Bankr.N.D.Ohio 1994); *Kellman v. P.S.E. & G. (In re Jolly "N", Inc.)*, 122 B.R. 897, 908–09 (Bankr.D.N.J. 1991); *Remes v. Consumers Power Co. (In re Camelot Motors Corp.)*, 86 B.R. 520, 522–23 (Bankr.W.D.Mich.1988); *Excel Enters., Inc. v. Sikes, Gardes & Co. (In re Excel Enters., Inc.)*, 83 B.R. 427, 431 (Bankr.W.D.La.1988).

■■■ Additionally, the subsequent new value must remain unpaid as of the petition date. *Steege v. Affiliated Bank/North Shore National (In re Alper–Richman Furs, Ltd.)*, 147 B.R. 140, 156 n. 17 (Bankr.N.D.Ill.1992); *Chaitman*, 62 B.R. at 686. Further, postpetition extensions of unsecured credit to the debtor are not encompassed by Bankruptcy Code § 547(c)(4) and may not be set off against prior preferential transfers to reduce the creditor's preference exposure. *See*

*Clark v. Frank B. Hall & Co. of Colo. (In re Sharoff Food Serv., Inc.)*, 179 B.R. 669, 678 (Bankr.D.Colo.1995); *Wallach v. Vulcan Steam Forging (In re D.J. Management Group)*, 161 B.R. 5, 6 (Bankr.W.D.N.Y.1993); *Warsco v. Ryan (In re Richards)*, 92 B.R. 369, 372 (Bankr.N.D.Ind.1988).

■ As found above, however, Defendant did establish at trial that the alleged new value shipments were actually received by the Debtor or its dealers, and that the new value shipments remained unpaid as of the Petition Date. Thus, Defendant established under § 547(c)(4) a subsequent new value defense to the preferential transfers.

### Calculation of the Subsequent New Value Deduction

■ As discussed earlier, the Committee previously demonstrated in the Common Issues trial that the Debtors were insolvent during the Preference Period. In proving this element of its preference case, the Committee presented evidence to the Court reflecting that the Debtors' liabilities exceeded their assets on a consolidated basis. In reaching the conclusion that Schwinn was insolvent during the Preference Period, the Court held that the Committee "properly consolidated the Schedules of the nine affiliated Schwinn debtors because the bankruptcy estates of the debtors were previously consolidated by Order of this Court." *Common Issues Opinion*, 192 B.R. at 488. After treating the Debtors as a consolidated entity in proving the insolvency element of its preference claim, Defendant argues that the Committee is judicially estopped from arguing that the Debtors should be treated separately and their consolidation ignored for purposes of calculating the new value advanced by True Fitness.

■ "Judicial estoppel, also known as *estoppel in pais* or the doctrine of inconsistent positions, prevents a party that has benefited from taking one position in litigating a particular set of facts from later reversing its position when it is to its advantage to do so." *In re Hutchins*, 162 B.R. 1014, 1020 (Bankr. N.D.Ill.1994) (Schmetterer, J.). "The doctrine is intended to protect the courts from being manipulated by litigants who seek to

prevail twice on opposite theories." *Id.* Although the doctrine is usually applied to successive suits, it is not so limited. *Continental Illinois Corp. v. Commissioner of Internal Revenue*, 998 F.2d 513, 518 (7th Cir. 1993), *cert. denied*, 510 U.S. 1041, 114 S.Ct. 685, 126 L.Ed.2d 652 (1994). "A party can argue inconsistent positions in the alternative, but once it has sold one to the court it cannot turn around and repudiate it in order to have a second victory...." *Id.*

■ There are certain boundaries on application of judicial estoppel. First, the litigant's later position must be clearly inconsistent with the earlier position. Second, the facts at issue must be the same. Third, the party to be estopped must have convinced the court to adopt its position; a litigant is not forever bound to a losing argument. While a party must prevail on the position it took in the previous litigation, it is not essential that the party received a benefit from its earlier position. *See* discussion in *In re Hutchins, supra*, and cases cited there.

Defendant argues that the Committee's argument for Debtors to be treated as separate entities in determining the extent of True Fitness's § 547(c)(4) defense is inconsistent with the Committee's previous treatment of Debtors as a consolidated entity in proving them to be insolvent. Second, since the Committee's inconsistent positions have been taken in the same case, it argues that the facts at issue are the same now as in the Common Issues trial. Lastly, Defendant suggests that the Committee convinced this Court to adopt its position that the Debtors should be treated as a consolidated entity in the Common Issues trial and have reaped the benefit of that ruling in this and another Adversary proceeding it filed. *Common Issues Opinion*, 192 B.R. at 488.

Defendant also argues that the new value advanced by True Fitness should be calculated on a consolidated basis since True Fitness did not deal separately with each Debtor. The only contract involving True Fitness and any of the Debtors is the Letter Agreement between True Fitness and Schwinn Bicycle Company. The evidence is undisputed that the affiliates were supplied with treadmills

ordered pursuant to the Letter Agreement. As Lamar testified, treadmill orders were placed by Schwinn Bicycle Company rather than the individual subsidiaries or "Distribution Centers." *See* Def. Ex. 8, p. 25 (line 12)-p. 27 (line 20). Although True Fitness invoiced the subsidiaries separately, Schwinn Bicycle Company remained liable for payment under the August 25, 1989, modification of the Letter Agreement. As Thorholm testified, Schwinn Bicycle Company also decided whether the affiliates' checks to True Fitness would be sent or held. Since Debtors essentially did business with True Fitness as if they were one, Defendant argues they should be accorded similar treatment in determining the new value advanced by True Fitness.

Additionally, authorities indicate that debtors may be treated as a consolidated entity after their substantive consolidation. *See In re Parkway Calabasas, Ltd.,* 89 B.R. 832, 836–37 (Bankr.C.D.Cal.1988), *aff'd.,* 949 F.2d 1058 (9th Cir.1991); *In re Cooper,* 147 B.R. 678 (Bankr.D.N.J.1992); *Matter of Evans Temple Church of God in Christ and Community Center, Inc.,* 55 B.R. 976 (Bankr. N.D.Ohio 1986). In each of those cases, it was held that a substantive consolidation had an impact on pre-petition events.

Based on the foregoing, the Defendant argues that the Debtors must be treated as a consolidated entity in determining the extent of new value advanced by True Fitness. As earlier found, such a determination would reduce True Fitness's preference liability from $313,357.73 to $60,552.36; otherwise the reduction is only to $107,152.76.

However, the foregoing arguments are flawed. The doctrine of judicial estoppel requires that the two positions taken by the party sought to be estopped be clearly inconsistent and that the facts at issue in the two proceedings be the same. Def. Findings, p. 14. The doctrine should not be applied "where there is only an appearance of inconsistency between the two positions but both may be reconciled." *Matter of Cassidy,* 892 F.2d 637, 642 (7th Cir.), *cert. denied,* 498 U.S. 812, 111 S.Ct. 48, 112 L.Ed.2d 24 (1990).

Here the doctrine of judicial estoppel has no application or relevancy to this case because the legal and factual issues involved in this insolvency hearing and the Defendant's preference trial were completely different. The issue in the insolvency hearing was whether the consolidated Debtors were insolvent under a balance sheet test during the Preference Period. The Code uses a "balance sheet" test for the purpose of establishing insolvency in a preference action. *Common Issues Opinion,* 192 B.R. at 486, 11 U.S.C. § 101(32). In order to apply the balance sheet test in this case, the Committee and the Court had to consolidate the Debtors' schedules in order to eliminate intercompany transactions which had no real value and to determine the accurate value of Debtors' assets and liabilities. Contrary to the Defendant's assertion, the valuing of the Debtors on a consolidated basis at the insolvency trial did not constitute a determination that during the Preference Period each of the Debtors was liable for debts of each of the others. Rather, such a consolidation for the purpose of determining insolvency was the only practical manner of eliminating the valueless intercompany transactions that had been recorded on the Debtors' balance sheets.

In contrast to the insolvency trial, the key question for the purpose of calculating new value in this preference action is whether the Defendant historically dealt with Debtors separately or as one entity. This issue is separate from and unrelated to the issue litigated in the insolvency trial. The evidence presented in this preference trial established that the Defendant dealt with each of the Debtors separately. In their usual dealings, Defendant received separate purchase orders from each of the Debtors, sent separate invoices to each of the Debtors, shipped its product to each of the Debtors' dealers separately, received payment from the Debtors' individual operating accounts, and maintained a segregated credit account for each of the Debtors.

In sum, the judicial estoppel doctrine does not apply here because the Committee has not taken inconsistent positions and the facts at issue were not the same as at the insolvency trial. In addition, the Order consolidating these estates had only prospective effect and did not merge

the Debtors during the Preference Period.[2] The evidence further demonstrated that the Defendant dealt with each of the Debtors separately during their commercial relationship.

Calculating the Defendant's alleged subsequent new value defense on an individualized basis is consistent with the fundamental principles of limited liability for corporations. Under Illinois law, a corporation is generally not liable for the debts of its subsidiaries or of its parent. *Main Bank of Chicago v. Baker,* 86 Ill.2d 188, 204, 56 Ill. Dec. 14, 21, 427 N.E.2d 94, 101 (1981); *Olympia Equipment Leasing Co. v. Western Union Telegraph Co.,* 786 F.2d 794, 798 (7th Cir.1986); *see also Geschke v. CLDC Mgt. Corp. (In re CLDC Mgt. Corp.),* 1989 WL 157498, *8 (N.D.Ill.1989). Corporations are also not generally liable for debts of affiliate corporations such as sister corporations. *Main Bank,* 86 Ill.2d at 205, 56 Ill.Dec. at 22, 427 N.E.2d at 102. Even if Schwinn Bicycle Co. was liable for its subsidiaries' debts to the Defendant under the 1989 Agreement, which is not consistent with the parties' actual conduct, the Schwinn subsidiaries were not liable for each other's debts. In order to calculate Defendant's subsequent new value defense on a consolidated basis, it would have to be found in effect that each of the Schwinn entities was liable for debts of each of the others, and that therefore an alleged new value shipment from the Defendant to one of the Debtors constituted an extension of unsecured credit to each of the others. Such a conclusion is contrary to Illinois law and not supported by the weight of evidence as to the commercial relationship of parties involved here.

Contrary to Defendant's contention, the post-bankruptcy substantive consolidation of the Debtors' several bankruptcy estates does not support a calculation on a consolidated basis of the Defendant's new value defense to pre-bankruptcy transactions. The Defendant asserts not merely that the Court's December 22, 1993, Consolidation Order

should have retroactive effect back to the Petition Date despite prospective application by its terms, but also that it should be effective to warrant treating the several separate Debtors as if they had actually merged prior to or during the preference period.

In *Brandt v. Gerardo (In re Gerardo Leasing, Inc.),* 173 B.R. 379 (Bankr.N.D.Ill.1994), a bankruptcy trustee's argument that an order of substantive consolidation should have *nunc pro tunc* effect on the calculation of the statute of limitations for a preference action under Code § 546(a) was rejected for good reason. In *Brandt,* cases of three debtors were converted from Chapter 11 to proceedings under Chapter 7 of the Bankruptcy Code on different dates. On those different dates, the Chapter 7 trustee was appointed in each case, starting the running in each separate case of the two-year statute of limitations contained in § 546(a). *Brandt,* 173 B.R. at 387. Subsequently, the three bankruptcy estates were substantively consolidated. *Id.* at 384. The bankruptcy trustee argued that he was "constructively" appointed on the date of substantive consolidation and that therefore the statute of limitations for preference actions had not run. *Id.* at 387–8. The trustee's argument that the start date for the § 546(a) statute of limitations was somehow affected by a subsequent order of substantive consolidation was rejected.

The Defendant's argument here that an order of substantive consolidation can affect the manner in which the Defendant and the Debtors conducted business during the Preference Period is likewise misplaced. The Bankruptcy Code looks to events during the preference period, and has no room for some metaphysical transmutation of the corporate nature of parties during that period by the stroke of a judicial pen after a bankruptcy case is filed.

The ruling in *Brandt* accords with the decision in *Rafoth v. Bailey (In re Baker & Getty Fin. Services, Inc.),* 88 B.R. 792 (Bankr.N.D.Ohio 1988). In *Rafoth,* the issue was whether, in a preference action, an "in-

---

**2.** Paragraph 10 of the Consolidation Order expressly stated:

From and after the date of this order, all claims against the Debtors shall be treated as

claims against the substantively consolidated estate.
Consolidation Order, ¶ 10.

sider" of one of the consolidated debtors must be considered to be an "insider" of all of the consolidated debtors, solely because of the earlier substantive consolidation of the debtors' bankruptcy estates. *Rafoth*, 88 B.R. at 797. The *Rafoth* court determined that an "insider" of one of the consolidated debtors was not an "insider" of each of the other debtors merely as a result of the substantive consolidation order. *Id.* The court based its conclusion on the lack of a factual finding in its substantive consolidation order that the Debtors constituted a single corporate operation. *Id.* As in *Rafoth*, the consolidation order in the related Schwinn cases did not contain a factual finding that the several Debtors constituted a single corporate operation. *See* Ex. 4. Additionally, § 101(31), the Code provision at issue in *Rafoth* defines "insider" based on the person's relationship with the "debtor," the same defined term used in § 547(c)(4) to describe who must benefit from alleged subsequent new value. *See* 11 U.S.C. §§ 101(31) and 547(c)(4).

Based on facts surrounding the pre-petition relationship between this Defendant and the Debtors, and in light of the reasoning in *Brandt, supra,* and *Rafoth, supra,* it must be concluded that the proper method to calculate the new value defense asserted by True Fitness is on an individualized, debtor-by-debtor basis, setting off against preference payments received from each of the Debtors only the subsequent new value extended to that particular Debtor. As a result, the appropriate method of valuing the Defendants' alleged subsequent new value defense yields a reduced preference exposure of $107,-152.76.

### Ordinary Course Defense

In order to claim the ordinary course of business exception to preference avoidance, a preference defendant must prove that the challenged transfer was:

(a) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(b) made in the ordinary course of business or financial affairs of the debtor or the transferee; and

(c) made according to ordinary business terms.

11 U.S.C. § 547(c)(2) and (g); *Matter of Midway Airlines*, 69 F.3d 792, 797 (7th Cir.1995). The three subsections of § 547(c)(2) are distinct and each must be proven. *Milwaukee Cheese Wisconsin, Inc. v. Straus (Matter of Milwaukee Cheese Wisconsin, Inc.)*, 191 B.R. 397, 400 (Bankr.E.D.Wis.1995). Furthermore, to prevail on an ordinary course of business defense, a preference defendant must prove all of the elements of the defense. *Midway Airlines*, 69 F.3d at 797.

 Among the factors that courts consider under § 547(c)(2)(B) in determining whether transfers are ordinary in relation to past practices is whether the creditor engaged in any unusual collection activity during the preference period. *Solow v. Ogletree, Deakins, Nash, Smoak & Stewart (In re Midway Airlines, Inc.)*, 180 B.R. 1009, 1013 (Bankr.N.D.Ill.1995) (*citing In re Grand Chevrolet, Inc.*, 25 F.3d 728, 732 (9th Cir. 1994)). Payments made in response to unusual debt collection practices by the creditor are outside the scope of the ordinary course of business exception. *Marathon Oil Co. v. Flatau (In re Craig Oil Co.)*, 785 F.2d 1563, 1566 (11th Cir.1986); *Ellenberg v. Tulip Production Polymerics, Inc. (In re T.B. Home Sewing Enterprises, Inc.)*, 173 B.R. 782, 787 (Bankr.N.D.Ga.1993). In order to demonstrate the applicability of § 547(c)(2)(B), the creditor must prove:

> the absence of any unusual collection efforts or protectionist demands directed at the debtor, and the absence of any other significant or material change in the way it treated the debtor during the preference period. . . .

*Marlow v. Fed. Compress & Warehouse Co. (In re Julien Co.)*, 157 B.R. 834, 838 (Bankr. W.D.Tenn.1993). Unusual collection efforts may include telephone calls or letters. *Ellenberg*, 173 B.R. at 788.

In this case, the evidence clearly showed much unusual collection activity on Defendant's part during the Preference Period. The collections telephone calls between Defendant's President and Lamar, and Lamar and Murray's involvement in the Debtors'

accounts payable, were unusual and inconsistent with the parties' ordinary course of business. According to Lamar and Thorholm, they concluded from the collection calls made by Defendant that the Debtors would not be able to obtain new product unless they paid the outstanding invoices to the Defendant. That was a reasonable conclusion on their part given the frequency and urgency of the calls. Thus, the collection calls resulted in the Defendant receiving the transfers instead of other creditors of the Debtors. In this regard alone, Defendant has therefore failed to meet its burden under § 547(c)(2)(B).

▇▇▇▇ The last element of a preference defendant's ordinary course of business defense requires that it prove that the preferential transfer was "made according to ordinary business terms." 11 U.S.C. § 547(c)(2)(C). The "ordinary business terms" test is an objective test which focuses on the practices of the creditor's competitors. *Midway Airlines*, 69 F.3d at 795. Evidence of the creditor's dealings with other customers is insufficient to prove "ordinary business terms." *Midway Airlines*, 69 F.3d at 797–98. A creditor's evidence on the "ordinary business terms" may not be vague and must be based on personal first-hand knowledge gained from exposure to the competitors' collections practices during or near the preference period. *Midway Airlines*, 69 F.3d at 799, n. 9. General testimony by an employee of the defendant, unsupported by any specific data, is insufficient to prove "ordinary business terms." *Sacred Heart Hospital v. O'Reilly Servicing Corp. (In re Sacred Heart Hospital of Norristown)*, 200 B.R. 114, 118 (Bankr.E.D.Pa.1996) (citing *Advo–System Inc. v. Maxway Corp.*, 37 F.3d 1044, 1051 (4th Cir.1994)).

Under § 547(c)(2)(C), a preference defendant must introduce evidence of its competitors' accounts receivable and collections practices and also of the actual payment practices of its competitors' customers. In *Matter of Tolona Pizza Products Corp.*, 3 F.3d 1029 (7th Cir.1993), the Seventh Circuit opinion affirmed the district court's ruling that a preference defendant had proven the elements of the ordinary course of business defense, including the "ordinary business

custom" element. However, in *Tolona*, the defendant sausage-maker's vice-president, who had "extensive" experience in the meat packing industry, testified not only as to the industry's norm for contractual payment terms, but also as to the actual accounts receivable and collections practices of the defendant's competitors. *Tolona*, 3 F.3d at 1033. The Seventh Circuit stated:

> Stiehl's testimony brought the case within the scope of ordinary business terms ... Rose [the defendant] and its competitors pay little or no attention to the terms stated on their invoices, allow most customers to take up to 30 days to pay, and allow certain favored customers to take even more time.

*Id.*

In other cases where preference defendants have successfully proven ordinary course of business defenses, the defendants have also presented evidence of their competitors' receivables and collections practices and of the actual payment practices of the defendants' competitors' customers. In *Solow, supra*, the evidence included the debtor's payment history to its other law firms and also evidence of the defendant's competitors' accounts receivables practices and the aging of their accounts. *Solow*, 180 B.R. at 1016. The *Solow* bankruptcy court expressly distinguished that case from another in which the defendant's president had admitted that he had no knowledge of his competitors' receivables practices. *Id.* In *Luper v. Columbia Gas of Ohio, Inc. (In re Carled, Inc.)*, 91 F.3d 811 (6th Cir.1996), a case in which the Sixth Circuit reversed the district court in ruling that the defendant has proven an ordinary course of business defense, the defendant introduced evidence of the actual billing and collection practices of its affiliates and one of its competitors. *Luper*, 91 F.3d at 814. Likewise, in *McCord v. Venus Foods, Inc. (In re Lan Yik Foods Corp.)*, 185 B.R. 103 (Bankr.E.D.N.Y.1995), the successful preference defendant's vice-president testified as to its competitors tolerance for late payments. *McCord*, 185 B.R. at 114.

Unlike the defendants in the above-cited cases, this Defendant did not establish its competitors' accounts receivable or collec-

tions practices or the actual payment practices of its competitors' customers. The Defendant's only evidence on the issue of "ordinary business terms" was Stallings' testimony which was limited to the contractual payment terms of the Defendant itself and of one other home use treadmill company, Precor. The Defendant presented no evidence as to contractual payment terms of the several treadmill manufacturing companies other than the Defendant and Precor, no evidence as to actual payment practices of the customers of any treadmill company other than those of the Defendant, and no evidence of the collections practices of any treadmill company other than the Defendant itself. Thus, the Defendant failed to meet its burden to prove "ordinary business terms" under § 547(c)(2)(C). The Defendant's asserted ordinary course of business defense therefore fails entirely as to each of the transfers.

### Interest to be Awarded

While an award of prejudgment interest is generally within the bankruptcy court's discretion, *In re Vic Bernacchi & Sons, Inc.*, 170 B.R. 647, 656 (Bankr.N.D.Ind. 1994), it has properly been held in actions to recover a preferential transfers that the victorious plaintiff is entitled to prejudgment interest from the date of demand for return or, if no demand was made, from commencement of the adversary proceeding. *In re Pearson Industries, Inc.*, 152 B.R. 546, 560 (Bankr.C.D.Ill.1993); *Vic Bernacchi*, 170 B.R. at 657. Prejudgment interest is awarded "to compensate debtor's estate for its inability to use the money or property during the time it was in the transferee's possession." *In re Energy Co-op., Inc.*, 130 B.R. 781, 792 (Bankr.N.D.Ill.1991) (citing *In re Art Shirt Ltd. Inc.*, 93 B.R. 333, 342 (E.D.Pa. 1988)); *see also In re U.S.A. Diversified Products, Inc.*, 193 B.R. 868, 881 (Bankr. N.D.Ind.1995), *aff'd*, 196 B.R. 801 (N.D.Ind.), *aff'd*, 100 F.3d 53 (7th Cir.1996) (citing *Partington v. Broyhill Furniture Indus. Inc.*, 999 F.2d 269, 274 (7th Cir.1993)). The Committee is therefore entitled to recover pre-judgment interest on the principal amount of its preference recovery from the date of its counsel's initial demand letter, July 13, 1994,

until the judgment is entered (thereafter at the statutory judgment rate).

The remaining question is what interest rate is appropriate. As with the award of prejudgment interest itself, the rate of interest is likewise within the court's sound discretion. *Energy Co-op*, 130 B.R. at 792 (citations omitted). Some bankruptcy courts have concluded that the coupon yield rate set forth in 28 U.S.C. § 1961 is appropriate. *In re Helen Gallagher Enterprises, Inc.*, 126 B.R. 997, 1005 (Bankr.C.D.Ill.1991). Others look to the state law rate of interest. *Pearson Indus. Inc.*, 152 B.R. at 560 (where an adversary is based on state law, state will control the award of prejudgment interest).

However, higher authority in this Circuit has suggested that district court judges "use the prime rate for fixing prejudgment interest where there is no statutory interest rate." *Gorenstein Enterprises, Inc. v. Quality Care–USA, Inc.*, 874 F.2d 431, 436 (7th Cir. 1989).

In *Gorenstein*, the Seventh Circuit found that "prejudgment interest should be presumptively available to victims of federal law violations. Without it, compensation of the plaintiff is incomplete and the defendant has an incentive to delay." 874 F.2d at 436. The Circuit noted that there is no federal statutory interest rate on prejudgment interest, but recommended using the prime rate for prejudgment interest in such a situation. *Id.* The prime rate is a "readily ascertainable figure which provides a reasonable although rough estimate of the interest rate necessary to compensate plaintiffs not only for the loss of the use of their money but also for the risk of default." *Id.* The Circuit noted that courts are bound by 28 U.S.C. § 1961 when awarding post-judgment interest, but "prejudgment interest is governed by federal common law, and the courts are free to adopt a more discriminating approach." *Id.* at 437. *See also U.S.A. Diversified*, 193 B.R. at 882.

Therefore, interest will be awarded here at the prime rate offered by one or more major banking institutions from time to time pursuant to the guidance in *Gorenstein*, and the judgment to be tendered will calculate interest on that basis. Should the parties dispute

the Plaintiff's basis for determining prime rate, the proofs will be reopened to allow litigation of that issue.

### *CONCLUSION*

The Committee has proven by a preponderance of the evidence each of the elements of a *prima facie* preference under § 547(b) as to each of the transfers to True Fitness that were complained of. The Defendant has proven a subsequent new value defense, but not an ordinary course of business defense. Thus, the Committee is entitled under §§ 547 and 550 of the Code to avoid and recover from the Defendant preferential transfers totaling $107,152.76, plus interest thereon, and the Committee will separately be granted a judgment against Defendant based thereon. Committee counsel is to prepare, circulate, and present a proposed judgment for the principal amount plus interest at the applicable prime rate or rates calculated to the judgment day. Since Defendant has prevailed on one of its defenses, but only partially, the judgment will provide that each party will bear its own costs.