**In re GGSI LIQUIDATION, INC., Debtor.**

**Gus A. Paloian, not individually but as Chapter 7 Trustee of the Bankruptcy Estate of GGSI Liquidation, Inc., Plaintiff,**

**v.**

**Quad–Tech, Inc., Defendant.**

**Bankruptcy No. 01 B 31747. Adversary No. 03 A 3849.**

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

Sept. 1, 2004.

William J. Factor, Louis S. Chronowski, Seyfarth Shaw LLP, Chicago, IL, for Trustee Gus Paloian.

Marie L. Nienhuis, Godfrey & Kahn, S.C., Milwaukee, WI; Barbara Yong, Karen Kranbuehl, Field & Golan LLP, Chicago, IL, for Quad–Tech, Inc.

## MEMORANDUM OPINION AND ORDER

A. BENJAMIN GOLDGAR, Bankruptcy Judge.

This matter is before the court on the motion of plaintiff Gus Paloian, trustee in this chapter 7 bankruptcy, for partial summary judgment against defendant Quad–Tech, Inc., a former customer of debtor GGSI.

The trustee filed his adversary complaint against Quad–Tech in September 2003. The complaint has five counts. Count I alleges that Quad–Tech received $827,832.90 in preferential transfers from GGSI and asks to have those transfers avoided. Count II seeks recovery of the transfers avoided under Count I plus prejudgment interest. Count III requests

disallowance of Quad–Tech's claim in the bankruptcy. Count IV alleges as an alternative to Counts I and II that the transfers were fraudulent conveyances. Count V seeks turnover of any amounts Quad–Tech owed GGSI under the other counts.

Quad–Tech answered the complaint and asserted two affirmative defenses to the preference claims: a new value defense under 11 U.S.C. § 547(c)(4), and an ordinary course defense under 11 U.S.C. § 547(c)(2). The trustee then moved for summary judgment on counts I, II, and V of his complaint.

As discussed below, the affirmative defenses are the heart of the matter and dictate the outcome here. Because the trustee cannot defeat both defenses, his motion for summary judgment on counts I, II, and V of the complaint must be denied. The court will, however, make Rule 56(d) findings on Quad–Tech's new value defense.[1]

### 1. Facts

The following facts are undisputed. Quad–Tech is a manufacturer of auxiliary control systems for printing presses and related materials. (P. 7056–1 Stmt. at ¶ 9; D. 7056–1 Resp. at ¶ 9).

During the 90–day preference period before GGSI's bankruptcy, June 12, 2001 to September 9, 2001 (D. 7056–1 Stmt. at ¶ 11; P. 7056–1 Resp. at ¶ 11), GGSI paid Quad–Tech $827,832.90 (Compl. ¶ 12; Answer ¶ 12). At the time, Quad–Tech had a right to these payments on account of an antecedent debt GGSI owed Quad–Tech for goods shipped, and Quad–Tech was a creditor of GGSI. (Compl. ¶¶ 13–15; Answer ¶¶ 13–15). GGSI made the payments to Quad–Tech when GGSI was insolvent. (P. 7056–1 Stmt. at ¶ 23; D. 7056–1 Resp. at ¶ 23). The payments enabled Quad–Tech to receive more than it would have received had the transfers not been made and had Quad–Tech received payments of the amounts owed under the provisions of chapter 7. (P. 7056–1 Stmt. at ¶¶ 24, 27; D. 7056–1 Resp. at ¶¶ 24, 27).

During the preference period, Quad–Tech also shipped new goods to GGSI, supplying GGSI with $804,244 in new value. (P. 7056–1 Stmt. at ¶ 28; D. 7056–1 Resp. at ¶ 28; D. 7056–1 Stmt. at ¶¶ 18–21, 23, 26, 27, 30, 32, 34, 36, 38, 40, 44; P. 7056–1 Resp. at ¶¶ 18–21, 23, 26, 27, 30, 32, 34, 36, 38, 40, 44).

In exchange for the $804,244 in new value, GGSI paid Quad–Tech $381,631, Goss U.K. paid Quad–Tech $9,520, and another entity, Ann Arbor News, paid Quad–Tech $329,299.[2] (P. 7056–1 Stmt. at ¶¶ 29–30; D. 7056–1 Resp. at ¶¶ 29–30). In June 2000, Ann Arbor News and GGSI entered into an agreement for GGSI to sell, manufacture, deliver, and install offset printing units and auxiliary equipment. (Ex. C to P. Reply). Ann Arbor News was to pay portions of the total purchase price to GGSI as GGSI made progress in this process. (*Id.*) Ann Arbor News was authorized by an order of this court to pay GGSI's vendors directly and then offset

---

1. In February 2004, Quad–Tech moved to enforce a settlement agreement in the adversary proceeding it claimed to have negotiated with Novare, the trustee's agent. The court (Doyle, J.) treated Quad–Tech's motion as one for summary judgment. The parties agree that the question of whether the trustee (through Novare) ratified a settlement agreement with Quad–Tech is not currently before the court. (*See* D. Resp. at 3 n. 1; P. Mem. at 5 n. 2). Quad–Tech's motion and the settle- ment question therefore will not be addressed.

2. Ann Arbor News is a Michigan newspaper publisher and printer. (*See* Ex. C to P. Reply). The parties' summary judgment materials do not identify "Goss U.K."; presumably, it is a British subsidiary or other affiliate of GGSI.

those payments against amounts it owed GGSI. (Docket Item No. 492 in Case No. 01–31747). Ann Arbor News set off the amount it paid to Quad–Tech against the amount Ann Arbor News owed to the debtor. (P. 7056–1 Stmt. at ¶ 31; D. 7056–1 Resp. at ¶ 31).

Both parties acknowledge that $83,411 of the new value Quad–Tech gave to GGSI remains unpaid and is a credit against the preferential transfers. (P. 7056–1 Stmt. at ¶ 33; D. 7056–1 Resp. at ¶ 33).

During the preference period, GGSI made eight payments to Quad–Tech. (P. 7056–1 Stmt. at ¶ 37 (Chart F); D. 7056–1 Resp. at ¶ 37; D. 7056–1 Stmt. at ¶ 17, 22, 24, 25, 28, 29, 42, 43; P. 7056–1 Resp. at ¶ 17, 22, 24, 25, 28, 29, 42, 43). The payments ranged from $400 to $244,121. (D. 7056–1 Stmt. at ¶ 22; D. 7056–1 Resp. at ¶ 22; P. 7056–1 Stmt. at ¶ 37; D. 7056–1 Resp. at ¶ 37). From August 2000 until June 2001 (before the preference period), GGSI made 84 payments to Quad–Tech, ranging from $56 to $186,962. (P. 7056–1 Stmt. at ¶ 38 (Chart G); D. 7056–1 Resp. at ¶ 38).

### 2. Discussion

The uncontested facts establish all the elements of a preference avoidable under section 547(b), a point the parties do not dispute. The motion currently before the court is really aimed at Quad–Tech's two affirmative defenses under section 547(c). *See Schwinn Plan Comm. v. AFS Cycle & Co. (In re Schwinn Bicycle Co.)*, 205 B.R. 557, 568 (Bankr.N.D.Ill.1997) (when trustee establishes elements of preference, burden shifts to defendant to prove affirmative defenses). The trustee asserts that neither defense has merit, and he is therefore entitled to summary judgment on his preference claims. Quad–Tech understandably disagrees.

The summary judgment standard under Rule 56 is familiar. Summary judgment is appropriate if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c) (made applicable in Fed. R. Bankr.P. 7056); *Estate of Allen v. City of Rockford*, 349 F.3d 1015, 1019 (7th Cir. 2003). On a motion for summary judgment, "the court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir.2003) (internal quotation omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Taking the second defense first, the trustee is not entitled to summary judgment on Quad–Tech's ordinary course defense because the facts the trustee has presented, though undisputed, are insufficient to deprive Quad–Tech of its defense as a matter of law. The trustee's summary judgment motion on Counts I, II and V must therefore be denied. As to the first defense, new value, the court is able to make findings under Rule 56(d): that the defense is invalid as to all of the new value but $83,411. With respect to the $83,411, the court finds Quad–Tech has a valid new value defense to the trustee's claims.

### a. Ordinary Course

The trustee is not entitled to summary judgment because he has not defeated Quad–Tech's second affirmative defense— that the preference payments Quad–Tech received from GGSI were made in the ordinary course of business.

Section 547(c)(2) of the Code provides that a trustee may not avoid a transfer if the transfer was "(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee; (B) made

in the ordinary course of business or financial affairs of the debtor and the transferee; and (C) made according to ordinary business terms." 11 U.S.C. § 547(c)(2). The purpose of this "ordinary course" defense is to protect recurring and customary credit transactions that were not preferential precisely because they occurred in the ordinary course of business. *Kleven v. Household Bank*, 334 F.3d 638, 642 (7th Cir.2003); *In re Midway Airlines, Inc.*, 69 F.3d 792, 797 (7th Cir.1995).

■ To establish an ordinary course defense, a creditor must prove three elements, two sometimes described as "subjective" and a third that is "objective." *See Midway*, 69 F.3d at 797–99. The subjective elements, subsections (A) and (B) of section 547(c)(2), focus on "the specific relationship between the parties and the particular course of dealing between the parties," *Barber v. Golden Seed Co., Inc.*, 129 F.3d 382, 390 (7th Cir.1997), and require the creditor to show that "the transaction was ordinary as between the parties," *Midway*, 69 F.3d at 797. Relevant factors include "(1) the length of time the parties were engaged in the transaction at issue; (2) whether the amount or form of tender differed from past practices; (3) whether the debtor or creditor engaged in any unusual collection or payment activity; and (4) whether the creditor took advantage of the debtor's deteriorating financial condition." *Kleven*, 334 F.3d at 642.

■ The objective element, subsection (C), focuses on "industry standards and common practice," *Barber*, 129 F.3d at 390, and requires the creditor to show that the transaction was "ordinary in the industry examined as a whole," *Midway*, 69 F.3d at 797. To make that showing, the creditor need not establish "the existence of some single, uniform set of business terms" but must only show that its dealings with the debtor were not "so idiosyncratic" as to fall beyond "the outer limits of normal industry practices." *In re Tolona Pizza Prods. Corp.*, 3 F.3d 1029, 1033 (7th Cir.1993); *see also Barber*, 129 F.3d at 390; *Midway*, 69 F.3d at 797.

■ In this case, the trustee ignores industry practice and tries to knock out Quad–Tech's ordinary course defense by attacking the subjective elements alone. The trustee argues that the preference period payments were made outside the ordinary course of business because the payments were not made at the same time as the typical payment during the pre-preference period. (*See* P. Mem. at 11–16).

To demonstrate this, the trustee offers two charts. The first plots the 84 payments GGSI made to Quad–Tech *before* the preference period and the number of days between billing and payment. (P. 7056–1 Stmt. at ¶ 38). From this data, the trustee calculates that during the pre-preference period it took an average of 50 days for GGSI to pay an invoice. (*Id.*). The second chart then compares payments *during* the preference period to the baseline, showing the amount by which each individual payment deviated either because the invoice was paid earlier or because it was paid later. (*Id.* at ¶ 43). Because every payment deviated from the baseline, the trustee concludes that the preference period payments "simply cannot be considered 'ordinary' course payments." [3] (P. Mem. at 13).

---

**3.** There is no material dispute about the trustee's raw data. Quad–Tech quarrels with the trustee's "invoice aging" figures because they assume that it took 7 days for each check to clear. But aside from that possible problem, Quad–Tech does not deny that the charts contain accurate information. (*See* D. 7056–1 Resp. at ¶¶ 38, 40).

■ This mechanical analysis is unconvincing. First, the trustee's use of an average payment time for the pre-preference period gives the impression that GGSI had a regular payment practice during that period. It did not. The times when GGSI paid individual invoices before the preference period in fact varied widely. One invoice, for example, was paid even before it was sent out, so the "invoice aging," as the trustee calls it, was zero. (P. 7056–1 Stmt. at ¶ 40 (invoice dated Nov. 22, 2000)). Another invoice was paid 194 days—more than six months—after it was billed. (*Id.* (invoice dated April 28, 2000)). Taking just the initial 25 invoices on the trustee's chart as a sample, payments were made 0, 6, 7, 16, 30, 34, 35, 36, 40, 41, 42, 46, 47, 44, 56, 60, 98, 118, and 194 days after billing. (*Id.*). The raw data, in other words, show that GGSI did not pay invoices at consistent times during the pre-preference period. And since GGSI had no regular payment practice, the trustee's use of an average to claim otherwise is unpersuasive.

Second, even if GGSI had had a regular pre-preference period payment practice, the relevant question would be how much GGSI's *practice* during the preference period deviated from its earlier practice. To answer that question, the trustee would also have had to calculate an average payment time for the preference period. But he offers no such average. Instead, the trustee holds up *individual* preference pe-riod payments against his pre-preference average. That comparison is not informative and does not answer the ordinary course question here.[4]

Third, the trustee's approach to the ordinary course defense is inconsistent with the law. No case the trustee has cited approves a comparison of the times when *individual* preference period payments were made with the *average* time of pre-preference period payments. At least one court has disapproved a similar approach. *See Global Distrib. Network, Inc. v. Star Expansion Co. (In re Global Distrib. Network, Inc.)*, 103 B.R. 949, 954 (Bankr. N.D.Ill.1989) (stating that a comparison of individual preference period payment times with the range of pre-preference period payment times is "not an accurate indicator of the ordinary course of business").

Even a comparison of average payment times would likely have been insufficient standing alone. True, *In re Xonics Imaging, Inc.*, 837 F.2d 763, 767 (7th Cir.1988), held that a debtor's "fail[ure] to make payments within the time required by his contract with the creditor is presumptively nonordinary," and *Global Distrib. Network*, 103 B.R. at 954, relied on such a comparison.[5] Recent decisions from the court of appeals, however, do not mention *Xonics* or *Global Distrib. Network* and endorse a more elaborate, multi-factor analysis. *See, e.g., Kleven*, 334 F.3d at

---

4. Had the trustee calculated an average payment time for the preference period, the result would not necessarily have helped his case. The trustee would have discovered that the average payment time during the preference period was 42 days, as opposed to 50 days before the preference period. (*See* P. 7056–1 Stmt. at ¶ 40). It is debatable whether paying bills in six weeks rather than seven is a sufficiently significant change to make the six-week payments outside the ordinary course of business.

5. *Xonics*, it is worth noting, also said that late payments may be in the ordinary course of business, the contract notwithstanding, if lateness was the parties' practice. *See id.* at 765–66 ("Nothing in the statute or its history indicates that late payments can never be in the ordinary course," and "[w]e do not see why in such a case [where payments are routinely made late] the parties' 'ordinary course of business' should be defined by 'their contract rather than by their practice'").

642; *Barber,* 129 F.3d at 390. "Statistical comparisons ... and the differing lengths of time in payment per *In re Global Distribution Network,*" then, "do not end the inquiry," as the trustee here assumes. *Solow v. Ogletree, Deakins, Nash, Smoak & Stewart (In re Midway Airlines, Inc.),* 180 B.R. 1009, 1013 (Bankr.N.D.Ill.1995).

Because the uncontested facts the trustee has presented do not show that GGSI's transfers during the preference period were made outside the ordinary course of business, the trustee's motion for summary judgment on Counts I, II and V of his complaint must be denied.

### b. New Value Defense

Given that Quad–Tech's ordinary course defense spells the demise of the trustee's motion, there would ordinarily be little point in addressing his arguments about Quad–Tech's new value defense. Here, however, the facts relating to the new value defense are undisputed, allowing the court at least to issue findings under Rule 56(d), Fed.R.Civ.P. 56(d), findings that dispose of the defense.

■ Section 547(c)(4) declares that a trustee may not avoid a transfer "to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor ... on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor." 11 U.S.C. § 547(c)(4). The theory underlying this "new value" (or "subsequent advance") defense is that "to the extent new value is offered, the preference is repaid to the estate." *In re Prescott,* 805 F.2d 719, 727 (7th Cir.1986); *see also Kroh Bros. Dev. Co. v. Continental Constr.*

*Engineers, Inc. (In re Kroh Bros. Dev. Co.),* 930 F.2d 648, 652 (8th Cir.1991) (noting that creditor who advances new value to the estate after receiving a preferential transfer "in effect returns the preference to the estate" (internal quotations omitted)); *Chaitman v. Paisano Automotive Liquids, Inc. (In re Almarc Manuf., Inc.),* 62 B.R. 684, 686 (Bankr.N.D.Ill.1986).

■ For the defense to apply, however, the following sequence of events must have taken place: (1) the creditor must have received a preference otherwise voidable under section 547(b); (2) after receiving the preferential transfer, the creditor must advance additional unsecured credit to the debtor; and (3) the additional credit must be unpaid. *Prescott,* 805 F.2d at 728; *Moglia v. American Psychological Ass'n (In re Login Bros. Book Co., Inc.),* 294 B.R. 297, 299 (Bankr.N.D.Ill.2003); *Brandt v. Sprint Corp. (In re Sonicraft, Inc.),* 238 B.R. 409, 414 (Bankr.N.D.Ill. 1999); *Schwinn,* 205 B.R. at 568; *Almarc,* 62 B.R. at 686.

■ Quad–Tech meets the first and second of these elements. There is no question that Quad–Tech received a transfer of $827,832.90 in payment for goods shipped, a transfer preferential under section 547(b). There is also no question that during the same period Quad–Tech advanced GGSI unsecured credit, shipping goods to GGSI worth $804,244.[6] The problem for Quad–Tech comes with the third element. Except for $83,411, the new value did not remain unpaid: GGSI, Goss U.K. and Ann Arbor News paid Quad–Tech $720,833 for the goods shipped. Therefore, Quad–Tech has a new value

---

6. In its Rule 7056–1 statement of undisputed facts, the trustee appears to take the position that GGSI did not benefit from the new value to the extent that goods were shipped to third parties, specifically to Ann Arbor News. The point is not argued in the trustee's memorandum and so is waived. *See Illinois Dep't of Revenue v. Schechter,* 195 B.R. 380, 384 n. 2 (N.D.Ill.1996) (arguments not raised before bankruptcy court are waived).

defense for $83,411 of the $804,244 but no defense for the remaining $720,833.

Quad–Tech disputes this conclusion, however, arguing that the law in this circuit does not require new value to remain unpaid. Contrary statements in *Prescott*, Quad–Tech says, were merely "dicta."

Quad–Tech is mistaken. In *Prescott*, the court of appeals expressly declared that "[s]ection 547(c)(4) establishes a subsequent advance rule whereby a preferential transfer is insulated from a trustee's avoiding powers to the extent that a creditor extends new value, which is unsecured and *remains unpaid*." *Prescott*, 805 F.2d at 728 (emphasis added) (citation omitted). The court then applied that requirement to the facts of the case, finding that Marine Bank, a creditor, had no new value defense under section 547(c)(4) because "it never showed that any overdrafts were unpaid." *Id.* Since that was *Prescott's* holding, not just a set of extraneous remarks, it cannot be dismissed as mere dicta. *See United States v. One Parcel of Real Estate*, 135 F.3d 462, 465 (7th Cir.1998) (defining dicta as statements in an opinion "unnecessary to the holding in the case").

Courts have regularly read *Prescott* as standing for the proposition that the new value must remain unpaid. Our court of appeals has. *See P.A. Bergner & Co. v. Bank One, Milwaukee, N.A. (In re P.A. Bergner & Co.)*, 140 F.3d 1111, 1121 (7th Cir.1998) (citing *Prescott* and stating that new value defense failed because creditor "gave no subsequent unsecured credit which remained unpaid"). Courts of appeals elsewhere have, as well. *See, e.g., Mosier v. Ever–Fresh Food Co. (In re IRFM, Inc.)*, 52 F.3d 228, 231 (9th Cir. 1995); *Kroh Bros.*, 930 F.2d at 652. So has this court. *See, e.g., Login Bros.*, 294 B.R. at 299 (citing *Prescott* and holding that one of "key elements" of defense is

that "the new value must remain unpaid"); *Schwinn*, 205 B.R. at 568 (same).

Citing the Ninth Circuit's decision in *IRFM* (among others), Quad–Tech insists that courts these days tend to take a different approach to the "unpaid" question under section 547(c)(4), an approach Quad–Tech describes as more in tune with the statutory language, with the legislative history, and with public policy. The relative merit of the different approaches, of course, is beside the point here: this court must follow the decisions of Seventh Circuit. *Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1029, 2004 WL 1854076, at *2 (7th Cir. Aug.19, 2004) (reminding district court that decisions of courts of appeals are binding on lower federal courts in same circuit).

Still, it is worth noting that the *IRFM* approach is no help to Quad–Tech. That approach simply permits a new value defense, repayment notwithstanding, if the repayment was *itself* an avoidable transfer. *See IRFM*, 52 F.3d at 231; *Laker v. Vallette (In re Toyota of Jefferson, Inc.)*, 14 F.3d 1088, 1092–93 (5th Cir.1994); *Chrysler Credit Corp. v. Hall*, 312 B.R. 797, 804–06 (E.D.Va.2004); *see generally* Deborah L. Thorne & Jesus E. Batista, *Are All Creditor "Animals Equal"? Treatment of New Value Under § 547*, Am. Bankr.Inst. J., April 2004, at 22. It does not render repayment utterly irrelevant, so that the defense remains available any time new value is given regardless of whether there has been repayment. Quad–Tech has not asserted that the repayments here were themselves avoidable. Therefore, it is not evident that Quad–Tech would have a new value defense even under *IRFM*.

Failing to avoid *Prescott*, Quad–Tech next contends that at least some of its preferential transfers remained unpaid because $329,299 of the $804,244 payment came from Ann Arbor News, a third party.

That makes a difference, Quad–Tech says, because GGSI was a contractor and Quad–Tech a subcontractor on the job at Ann Arbor News, and under the Michigan Builders Trust Fund Act monies Ann Arbor News paid to GGSI did not become property of the estate but were held in trust for subcontractors—including Quad–Tech.

■ The problem with this argument is that the Michigan Builder's Trust Fund Act did not apply to the work performed at Ann Arbor News. The Ann Arbor News job involved the installation of printing equipment, apparently at an existing building. As the trustee correctly points out, the Michigan Builder's Trust Fund Act protects members of the "building construction industry," meaning the industry that constructs buildings. Mich. Comp. Laws Ann. § 570.151 (1996). It does not protect entities engaged in the installation of equipment. *Chrystler v. South Bend Supply Co. (In re Skilled Trades Co.)*, 1 B.R. 396 (Bankr.W.D.Mich.1979) (finding company that sold and installed air conditioners was not in the "building construction industry" for purposes of the Act).

The payment by Ann Arbor News to Quad–Tech therefore had an undeniable effect on GGSI's bankruptcy estate. *See Kroh Bros.*, 930 F.2d at 654 (suggesting that where payments are made by third parties, "the availability of the [new value] defense ... depends on the ultimate effect on the estate"). When Ann Arbor News set off its $329,299 payment to Quad–Tech against amounts Ann Arbor News owed GGSI, GGSI's estate was depleted. Put more simply, Quad–Tech was paid $329,299 for the goods it delivered (Quad–Tech's "new value"), and GGSI ended up out the same amount as a result. The new value Quad–Tech provided did not remain unpaid.

Pursuant to Rule 56(d), the court accordingly finds that Quad–Tech was only paid $720,833 for the $804,244 worth of goods it shipped, that Quad–Tech has a new value defense only for the difference of $83,411, and that Quad–Tech has no new value defense for the $720,833 that did not remain unpaid.

### 3. Conclusion

Trustee Gus Paloian's motion for summary judgment on Counts I, II and V of his complaint against Quad–Tech, Inc. is denied. The court makes the following findings pursuant to Rule 56(d) on Quad–Tech's second affirmative defense: Quad–Tech was paid $720,833 for the $804,244 in goods it shipped during the preference period; Quad–Tech has a valid new value defense pursuant to 11 U.S.C. § 547(c)(4) to the extent of the $83,411 that remained unpaid; and Quad–Tech has no valid new value defense to the extent of the $720,833 that did not remain unpaid.